EXHIBIT "A"

## IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

BETANCOURT CONSTRUCTION, INC.
and WESTCHESTER FIRE INSURANCE
COMPANY

Plaintiffs,

v.

BEYEL BROTHERS, INC.

Defendant.

_____

CIVIL DIVISION

CASE NO.: 15-23172 CA

**SUMMONS**

DATE 10/12/15  TIME 4:16pm

THE STATE OF FLORIDA
To Each Sheriff of the State:

INITIAL _SMM_  BADGE# 390

YOU ARE COMMANDED to serve this summons and a copy of the complaint or petition in this action on Defendant:

Serve:  BEYEL BROTHERS, INC., by serving its registered agent, Mark J. Beyel, or any other officer, director or employee at:

550 Cidco Rd., Cocoa, FL 32926

Each defendant is hereby required to serve written defenses to the complaint or petition on ALEXANDER E. BARTHET, Plaintiff's attorney, whose address is:

THE BARTHET FIRM
200 South Biscayne Boulevard, Suite 1800, Miami, Florida 33131
(305) 347-5290

within 20 days after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter.  If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

Pursuant to Florida Rule of Judicial Administration 2.516 and Florida Rule of Civil Procedure 3.030, undersigned counsel's primary electronic e-mail address and secondary electronic e-mail addresses for service in the above referenced case are:

Primary e-mail address: Alexander E. Barthet - alex@barthet.com
Secondary e-mail address: Peter B. Rowell - prowell@barthet.com
Assistant email: Marleen Masi - mmasi@barthet.com

DATED ON _OCT 0 8 2015_____.

Clerk of the Court

BY: _HORTENSE ROMER_____
Deputy Clerk

## IMPORTANTE

Usted ha sido demandado legalmente.   Tiene 20 Dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal.   Una llamada telefonica no lo protegera.   Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas.   Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.   Existen otros requisitos legales.   Si lo desea, puede usted consultar a un abogado inmediatamente.   Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous.   Vous avez 20 jours consecutifs a partir de la date de l'assignacion de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal.   Un simple coup de telephone est insuffisant pour vous proteger.   Vous etes oblige de deposer votre response ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause.   Si vous ne deposez pas votre reponse ecrite dans le relai requis , vous risquez de pedre la cause dinsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal.   Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat.   Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'an-nuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci- dessous.

2

## IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

BETANCOURT CONSTRUCTION, INC.
and WESTCHESTER FIRE INSURANCE
COMPANY

CIVIL DIVISION

CASE NO.: 15-23172 CA-01

        Plaintiffs,

v.

BEYEL BROTHERS, INC.

        Defendant.

_____/

## COMPLAINT

Plaintiffs, BETANCOURT CONSTRUCTION, INC. ("Betancourt") and WESTCHESTER FIRE INSURANCE COMPANY ("Westchester") sues Defendant, BEYEL BROTHERS, INC. ("Beyel" or "Defendant") and states:

## GENERAL ALLEGATIONS

1.      This is an action for damages in excess of $15,000.00, exclusive of interest, costs and attorney's fees and is within the jurisdiction of this Court.

2.      Betancourt is a Florida Corporation doing business in Miami-Dade County, Florida and is subject to this Court's jurisdiction.

3.      Westchester is a foreign corporation doing business in Miami-Dade County, Florida and is subject to this Court's jurisdiction.

4.      Beyel is a Florida Corporation doing business in Miami-Dade County, Florida and is subject to this Court's jurisdiction.

5.      Jurisdiction is proper in this Court pursuant to the Savings to Suitors Clause, 28 U.S.C.A. § 1333 and contracts attached hereto as Exhibits "A" and "B."

6.      Venue is proper in Miami-Dade County, Florida.

7.     All conditions precedent to bringing this action have occurred, been performed, or excused.

8.     Non-party, Harry Pepper & Associates, Inc. ("Harry Pepper") entered into a prime contract with NAVFAC Southeast, IPT South Atlantic on behalf of the United States Navy regarding Hurricane Sandy Waterfront Repairs at the US Naval Base located in Guantanamo Bay, Cuba (formally Contract No. N69450- 1 2-D- 1 272 Task Order 0002) (hereinafter "Prime Contract").

9.     Pursuant to Harry Pepper's Prime Contract, Betancourt entered into a subcontract ("Subcontract") with Harry Pepper, wherein Betancourt was to furnish, among other things, all materials, equipment, and labor, for the delivery and installation of all new piles, sub framing for piers, and rip rap (i.e. large boulders anchoring the shoreline) for the "Hurricane Sandy Waterfront Repairs" project located in Guantanamo Bay, Cuba (hereinafter "Project").

10.    Betancourt has been caused to retain the undersigned law firm and owes it a reasonable attorney's fee for its services in the furtherance of this matter.

**COUNT I**
**BREACH OF CONTRACT (BARGE)**
**(Betancourt v. Beyel)**

11.    Betancourt realleges paragraphs 1-10.

12.    On or about November 19, 2014, Betancourt and Beyel entered into a contract (hereinafter "Contract") whereby Beyel was to furnish an 1994 ABS Load Line Barge, commonly known as the Mobro 1210 (hereinafter "Mobro 1210 Barge"). A true and correct copy of the parties' agreement is attached hereto as Exhibit "A."

13.    Beyel further furnished to Betancourt for its work at the Project, a crane formally known as Linkbelt LS238H Lattice Boom Hydraulic Crawler Crane, Serial #F5J1-5688 (Unit #234) (hereinafter "Crane"). At the time of the charter of the Mobro 1210 Barge, Betancourt and

Beyel understood that the Crane would be located upon the Mobro 1210 Barge for the purpose of transferring boulders from a second barge to the shoreline pursuant to Betancourt's work according to the Subcontract between Harry Pepper and Betancourt.

14.     Paragraph 14 of the Contract states, in relevant part:

> Further, OWNER [Beyel] warrants ... that OWNER [Beyel] has exercised due diligence and prudence to insure that the vessel is seaworthy at the time of delivery.

15.     A vessel is seaworthy if it is reasonably fit for its intended use.

16.     The Mobro 1210 Barge is anchored, in part, by "spuds" or metal cylinders which travel through the deck of the Mobro 1210 Barge at "spud wells." The spuds are used to hold the barge in place during work.

17.     The charter of the Mobro 1210 Barge included spuds which were furnished by Beyel.

18.     To be considered seaworthy for the Project, the Mobro 1210 Barge was required to contain fully functioning spuds pursuant to Betancourt's work at the Project.

19.     Beyel's representatives stated to Betancourt that the spuds furnished with the Mobro 1210 Barge had been used in similar marine conditions to those for which Betancourt intended to use the Mobro 1210 Barge and that the spuds were the original spuds manufactured for the Mobro 1210.

20.     Beyel materially breached the Contract and the express warranty of seaworthiness contained therein by furnishing spuds which were defective and unseaworthy for the Project upon delivery of the Mobro 1210 Barge.

21.     Specifically, Beyel materially breached the Contract and its express warranty of seaworthiness by furnishing defective and unseaworthy spuds which:

3

    a.     Failed to properly anchor the Mobro 1210 Barge because they were not the original or correct spuds manufactured for, or otherwise suitable for, the Mobro 1210 Barge;

    b.     Bent at certain points such that the Mobro 1210 Barge could not be properly anchored for the work required by the Project;

    c.     Failed to fit appropriately and align within the spud wells and therefore failed to anchor the Mobro 1210 Barge;

22.    Beyel further materially breached the Contract and its express warranty of seaworthiness by failing to properly remedy the spud defects.

23.    Beyel welded "reducer plates" on top of the spud wells in an attempt to create a seaworthy Mobro 1210 Barge by fitting the spuds to the spud wells.

24.    The initial spuds experienced dimpling and bending within eight (8) working days and caused the Mobro 1210 Barge to be inoperable and unfit for its intended purpose.

25.    The defects and unseaworthy nature of the initial spuds were latent, concealed and not discernable upon an inspection performed with ordinary care.

26.    Beyel furnished a new set of spuds which were specially manufactured for the Mobro 1210 Barge, based on all reasonably available information to Betancourt, including but not limited to, engineered drawings of the Mobro 1210 Barge furnished by Beyel, and the confirmation of said information by Beyel.

27.    The information furnished by Beyel to Betancourt failed to contain the elliptical or oval shape of the spud wells.

28.    After attempting to use the new spuds, it was determined that the new spuds, which were believed to be the correct size, strength and shape (i.e. round) could not fit through

4

the Mobro 1210 Barge spud wells because spud wells were of an elliptical or oval shape as opposed to a round shape.

29.     The elliptical or oval shape of the spud wells were concealed and not discernable upon inspection performed with ordinary care and were latent in nature because the reducer plates had fully covered the spud wells, inter alia.

30.     As an industry standard, spud wells and spuds are round and not oval.

31.     Under protest, but with the consent and authorization of Beyel, Betancourt caused the manufacture and delivery of an additional set of spuds with an oval or elliptical shape which were specially manufactured for the Mobro 1210 Barge, based on all reasonably available information to Betancourt, including but not limited to, engineered drawings of the Mobro 1210 Barge furnished by Beyel, and the confirmation of said information by Beyel.

32.     Upon Betancourt's attempt to utilize the additional set of spuds and the additional spuds failed to reach the bottom of the barge because a concealed obstruction within the Mobro 1210 Barge's spud well prevented the spuds from traveling through the barge and anchoring the same.

33.     After a significant investigation for the latent cause of the obstruction, it was ascertained that the Mobro 1210 Barge spud wells had an approximate 4" wide x 8" long x 2-1/2" thick steel plate welded to the bottom of the spud well otherwise known as an "ear bud" that was not shown on any of the documentation or drawings furnished by Beyel.

34.     The ear buds were latent and otherwise concealed by marine growth around and covering the ear buds. The ear buds would not have been revealed by an inspection undertaken with ordinary care.

35.     Under protest, but with the consent and authorization of Beyel, Betancourt paid for the manufacture and delivery of a final additional set of spuds which were round in shape,

5

twenty-four inches in diameter and therefore capable of fitting within the spud wells of the Mobro 1210 Barge.

36.     Betancourt received three (3) different sets of drawings for the Mobro #1210 barge from Beyel. None of the drawings reflected the existing condition of the Mobro #1210 barge as it was delivered to Betancourt with respect to the elliptical spud wells or the "ear buds" contained at the bottom of the spud wells.

37.     The defective and unseaworthy spuds rendered the barge inoperable for extended periods of time thereby causing months of delay to Betancourt's work at the Project.

38.     Betancourt has suffered damages as a result of Beyel's material breaches of the Contract and the express warranty of seaworthiness contained therein, in an amount greater than one million five hundred thousand dollars and 00/100s ($1,500,000) which damages include, but are not limited to:

  a.     Rental charges for other equipment which could not be used exceeding $9,000 a day for several months and related delay damages with respect to the Project incurred as the result of the inoperable Mobro 1210 Barge.

  b.     All costs incurred in the manufacture and delivery of replacement spuds;

  c.     All costs incurred in the investigation of the defective spuds;

39.     Betancourt is entitled to its attorneys' fees pursuant to the Contract as the prevailing party.

WHEREFORE, Plaintiff, Betancourt Construction, Inc. demands that it be awarded a judgment for damages against Beyel Brothers, Inc. together with attorney fees, costs, interest, and such other relief that the Court deems equitable and just.

## COUNT II
## BREACH OF IMPLIED WARRANTY OF SEAWORTHINESS (BARGE)
### (Betancourt v. Beyel)

40.     Betancourt realleges paragraphs 1-39.

41.     The Mobro 1210 Barge charter carried with it an implied warranty of seaworthiness.

42.     A vessel is seaworthy if it is reasonably fit for its intended use.

43.     To be considered seaworthy for the Project, the Mobro 1210 Barge was required to contain fully functioning spuds pursuant to Betancourt's work at the Project.

44.     Beyel materially breached the implied warranty of seaworthiness by furnishing spuds which were defective and unseaworthy for the Project upon delivery of the Mobro 1210 Barge.

45.     Specifically, Beyel materially breached the implied warranty of seaworthiness by furnishing defective and unseaworthy spuds which:

  a.     Failed to properly anchor the Mobro 1210 Barge because they were not the original or correct spuds manufactured for, or otherwise suitable for, the Mobro 1210 Barge;

  b.     Bent at certain points such that the Mobro 1210 Barge could not be properly anchored for the work required by the Project;

  c.     Failed to fit appropriately and align within the spud wells and therefore failed to anchor the Mobro 1210 Barge;

46.     Beyel further materially breached the implied warranty of seaworthiness by failing to properly remedy the spud defects.

47.     Betancourt has suffered damages as a result of Beyel's material breaches of the implied warranty of seaworthiness contained therein, in an amount greater than one million five

7

hundred thousand dollars and 00/100s ($1,500,000) which damages include, but are not limited to:

    a.      All costs incurred in the manufacture and delivery of replacement spuds;

    b.      All costs incurred in the investigation of the defective spuds;

    c.      Delay and related damages with respect to the Project incurred as the result of the inoperable Mobro 1210 Barge.

48.     Betancourt is entitled to its attorneys' fees pursuant to the Contract as the prevailing party.

WHEREFORE, Plaintiff, Betancourt Construction, Inc. demands that it be awarded a judgment for damages against Beyel Brothers, Inc. together with attorney fees, costs, interest, and such other relief that the Court deems equitable and just.

## COUNT III
## BREACH OF CONTRACT (LANDING CRAFT)
### (Betancourt v. Beyel)

49.     Betancourt realleges paragraphs 1-48.

50.     Betancourt and Beyel entered into a contract (hereinafter "Landing Craft Contract") whereby Beyel was to furnish a 2014 Oregon Iron Works Landing Craft or what is commonly known as a "Push Boat" (hereinafter "Landing Craft").  A true and correct copy of the parties' agreement is attached hereto as Exhibit "B."

51.     Beyel materially breached the Landing Craft Contract by furnishing a Landing Craft which was defective and unseaworthy.

52.     Specifically, the Landing Craft failed to operate properly on numerous occasions such that it was rendered useless.

53.     Betancourt has suffered damages as a result of Beyel's material breaches of the Landing Craft Contract, which include, but are not limited to, the cost to remedy and investigate the defects and delay damages.

54.     Betancourt is entitled to its attorneys' fees pursuant to the contract as the prevailing party.

WHEREFORE, Plaintiff, Betancourt Construction, Inc. demands that it be awarded a judgment for damages against Beyel Brothers, Inc. together with attorney fees, costs, interest, and such other relief that the Court deems equitable and just.

## COUNT IV
## DECLARATORY ACTION
### (Westchester Fire Insurance Co. v. Beyel)

55.     Westchester realleges paragraphs 1-54.

56.     Westchester issued a Subcontract Payment Bond ("Payment Bond") numbered K08000037 as surety for Betancourt as bond principal for Betancourt's Subcontract with non-party, Harry Pepper. A true and correct copy of the Payment Bond is attached hereto as Exhibit "C."

57.     Beyel has made for payment under the Payment Bond for amounts it claims are due under its contracts with Betancourt.

58.     Subject to the terms and conditions of its bond a surety's liability is coextensive with its principal's liability.

59.     As alleged in Counts I and II Beyel breached its contractual obligations to Betancourt causing Betancourt to incur damages in excess of one million five hundred thousand dollars ($1,500,000).

60.     Beyel's Payment Bond claim is alleged to be in the amount of approximately five hundred two thousand forty two dollars and 26/100s ($502,042.26) as of September 21, 2015.

9

61.     Betancourt is entitled to set off the damages it has incurred against the amounts claimed by Beyel under its contracts with Betancourt and, as a result, is not indebted to Beyel under the contracts.

62.     Accordingly, since Betancourt is not indebted to Beyel, under the contracts, Westchester is not indebted to Beyel under the Payment Bond and has denied Beyel's claim under the Bond..

63.     Based upon Beyel's claim under the Bond and Westchester's denial of that claim there is a bona fide dispute between Westchester and Beyel and Westchester has a justiciable question as to the validity of Beyel's claim under the Payment Bond and is entitled to declaratory relief that Beyel does not have a valid claim under the Payment Bond.

WHEREFORE, Plaintiff, Westchester Fire Insurance Company, demands that the this Honorable Court enter a declaratory judgment determining that Beyel Brothers, Inc. possesses no right to claim against the Payment Bond together with attorney fees, costs, interest, and such other relief that the Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiffs, Betancourt and Westchester demand jury trial on all issues so triable.

Dated this 8th day of October, 2015.

**THE BARTHET FIRM**
Attorneys for Plaintiff, Betancourt Construction, Inc.
200 South Biscayne Blvd., Suite 1800
Miami, Florida 33131
(305) 347-5290 phone
(305) 377-8695 fax
alex@barthet.com – Primary
prowell@barthet.com – Secondary
mmasi@barthet.com – Assistant

ALEXANDER E. BARTHET
Florida Bar No. 173126
PETER B. ROWELL
Florida Bar No. 0017600

**COZEN O'CONNOR**
Attorneys for Plaintiff, Westchester Fire Insurance Co.
200 Four Falls Corporate Center Suite 400
West Conshohocken, PA 19428-2958
Office: 215-665-4630
Fax: 215-701-2424
Primary: rboote@cozen.com

/s/Robert MCL Boote
ROBERT MCL. BOOTE
Florida Bar No. 475157

11

## ABS BARGE BAREBOAT CHARTER AGREEMENT

19 day of November

THIS AGREEMENT is entered into this ~~12th day of November~~, 2014, by and between BEYEL BROTHERS, INC., hereinafter referred to as "OWNER", whose offices are located at 550 Cidco Road, Cocoa, Florida 32926 and Betancourt Construction, Inc. hereinafter known as "CHARTERER", whose offices are located at 10461 SW 16ᵗʰ Place, Davie, FL 33324.

WITNESSETH:

1.   OWNER does hereby charter, bareboat, and CHARTERER does hereby agree to hire, bareboat, the following described barge and accessories for the indicated period and rates to wit:

A.   EQUIPMENT: 1994 ABS Load Line Barge, 150' L x 50' W (Mobro 1210). This barge has an agreed stated value of $400,000.00

B.   CHARTER PERIOD: There is a minimum (2) two month charter period for said barge which will begin when the barge leaves the OWNER'S facility in Merritt Island, FL and will end when the barge is returned to the OWNER'S facility in Merritt Island, FL in like good order and condition as when received by CHARTERER.

C.   CHARTER HIRE: The barge charter hire will be $19,800.00, per month, with a 30 day pro-ration of hire per day (i.e. $660.00), or part thereof after (2) two months. The charter hire for the minimum stated charter period specified above shall become fully and irrevocably earned by OWNER upon the barge leaving OWNER'S dock for CHARTERER'S designated berth in and around Guantanamo Bay, Cuba.

D.   ~~CHARTER DECK BARGE PROTECTION PLAN: The CHARTERER at its expense will provide OWNER with a certified deck protection plan for OWNER'S barge which is prepared, certified and signed by a licensed engineer familiar with marine engineering, coastal construction as well as CHARTERER'S intended scope of use for said barge during the entire charter period.~~

E.   MOBILIZATION and DEMOBILIZATION: CHARTERER will pay OWNER the sum of $87,650.00 to have OWNER mobilize the barge from Merritt Island, FL and deliver the same to CHARTERER'S designated berth in Guantanamo Bay, Cuba, and the sum of $87,650.00 to have OWNER demobilize the barge from CHARTERER'S designated berth in Guantanamo Bay, Cuba and redeliver the vessel to OWNER'S facility in Merritt Island, FL. The total amount of $175,300.00 includes fuel each way.

F.   SECURITY DEPOSIT: CHARTERER will pay OWNER, a security deposit in the sum of $0. This amount will be held by the OWNER as security for the full, complete, and faithful performance of CHARTERER'S obligations hereunder. If CHARTERER fails to pay charter hire, repair costs, recertification costs, insurance deductibles which may arise or other charges due hereunder, or otherwise defaults with respect to any provision of this bareboat charter agreement, OWNER may use, apply, or retain all or any portion of said security deposit for the payment of any charter hire, repairs costs, recertification costs, insurance deductibles or other charge in default or for the payment of any other sum to which CHARTERER may become obligated by reason of CHARTERER'S default, or to compensate OWNER for any loss or damage which OWNER may suffer thereby. If OWNER so uses or applies all or any portion of



Initials   Initials

1

EXHIBIT "A"

said security deposit, CHARTERER shall, within ten (10) days after written demand therefore, deposit cash with OWNER in an amount sufficient to restore said security deposit to the full amount hereinabove stated. The security deposit, or so much thereof as has not theretofore been applied by OWNER as provided herein, shall be returned to CHARTERER within thirty (30) days after the expiration of the term of this bareboat charter agreement.

G.   CHARTER PAYMENT: The charter hire, survey fees (see section 5A) and round trip mobilization costs for the agreed (2) two month charter period is **$342,600.00** This amount is exclusive of any damages or additional costs, fees and expenses which may arise during the charter period. The above-noted charter hire, fees and costs plus the above- described security deposit in the sum of **$0**, must be paid in full together by CHARTERER to OWNER prior to commencement of this barge bareboat charter agreement. If this charter should extend beyond (2) two months then the above-stated monthly charter hire shall be issued and made payable to OWNER in full without discount every month, in advance, at the address of the OWNER as provided herein. After the minimum charter period, any unused advanced charter hire thereafter shall be immediately refunded to CHARTERER so long as CHARTERER is in strict compliance with all the terms and conditions of this charter agreement including but not limited to an off-hire survey that is satisfactory to OWNER showing no damage other than ordinary wear and tear to the barge and her equipment FURTHER, should CHARTERER, at any time fail to pay charter hire/rental when due, or fail to fulfill any other condition or obligation of this agreement then within five (5) days after written notice of default given to CHARTERER by OWNER, OWNER shall have the right to declare this agreement terminated, null and void, to take possession of the vessel wherever the same may be located without any notice of protest and without any interference by CHARTERER, it agents or assigns. Any delay in charter hire/rental payments shall be payable with interest due at 18% percent per annum.

2.   This charter is a full and complete demise of 1994 ABS Load Line Barge, 150' L x 50' W (Mobro 1210) to the CHARTERER, which CHARTERER shall, at its own expense, navigate, supply, operate and maintain said barge. OWNER retains no possession or control whatsoever of the barge during the term of this Agreement or any extension thereof. CHARTERER shall have exclusive possession, control, and command of the barge during said charter period. CHARTERER warrants the barge shall be employed by CHARTERER only in suitable, safe, lawful trade and operations, and will not be navigated nor used in any improper or negligent manner for its proposed service. CHARTERER further warrants that the barge will be employed only between and at safe ports, places, berths, or anchorages where she can be always safely afloat, and within the navigation limits of the applicable insurances.

3.   OWNER shall deliver the barge to CHARTERER at CHARTERER'S designated berth in Guantanamo Bay, Cuba. Upon termination the barge shall be redelivered to OWNER at CHARTERER'S designated berth in Guantanamo Bay, Cuba in like good order and condition as when received ordinary wear and tear excepted at Guantanamo Bay, Cuba (or elsewhere by mutual agreement) and the Charter Hire shall continue until such redelivery of the barge to Owner's facility in Merritt Island, FL. If on return of the barge, OWNER is put to any expense of repairs to the hull, deck, or superstructure of the barge or cleaning of the barge to put it in the same good, seaworthy and clean condition as upon delivery, CHARTERER agrees to reimburse OWNER for said expense and to pay charter hire until the date OWNER'S barge is returned to the same good, seaworthy and clean condition.


initials    initials

2

4. The delivery to CHARTERER of the barge shall establish conclusively that CHARTERER, has inspected or has caused to be inspected or has elected to waive inspection of the barge. CHARTERER acknowledges an opportunity to thoroughly inspect the barge and its machinery and appurtenances, or will make such an inspection before acceptance, and that he agrees to rely solely upon such inspection with respect to the condition of the barge or its suitability for the intended service, has found them fully satisfactory for his purposes, accepts them "as is", and acknowledges that there are no warranties or representations of seaworthiness of the barge or its machinery or equipment, or of their fitness or suitability for any particular purpose.

5. CHARTERER agrees to maintain the barge in a good and seaworthy condition during the term of this charter and will redeliver the barge to OWNER in the same good and seaworthy condition as when the barge was received, ordinary wear and tear excepted.

a) OWNER shall cause an on-charter hire condition survey to be conducted prior to possession of the barge by CHARTERER. **CHARTERER shall pay $1,500.00 for on-charter hire condition survey.** OWNER shall cause an off-charter hire condition survey to be conducted at the termination of the charter upon physical redelivery of the barge to the OWNER. **CHARTERER shall pay $1,500.00 for off-charter hire condition survey.** Upon written request to OWNER a copy of the condition survey(s) will be provided to CHARTERER. It is agreed by both parties that the said condition survey(s) shall be conclusive proof as to the damage, if any, sustained by the barge during the time of this charter. CHARTERER is to remove all welds flush to deck and if necessary paint such areas to OWNER's full satisfaction.

b) In the event damage greater than normal wear and tear is noted by the condition survey(s), then it shall be the CHARTERER'S absolute duty to: (i) pay OWNER for any and all costs and expenses that are necessary to fully repair all noted damages; (ii) pay OWNER for any and all costs and expenses associated with recertifying the barge; and (ii) pay the above-noted monthly Charter Hire in advance until the barge is fully repaired and recertified to the OWNER'S full and complete satisfaction.

c) The cost of said repairs and recertification's shall be payable by the CHARTERER immediately upon presentation to it of the repair and recertification invoices.

d) In the event OWNER performs repairs or caused repairs and/or recertification's to be performed by others on the barge, then CHARTERER shall be conclusively bound by the amount of said repair and recertification invoices and waives its rights to contest the reasonableness of the amount thereof.

e) It is further understood and agreed that in the event damage is noted as per this numbered paragraph, then physical redelivery of the barge by the CHARTERER shall not constitute acceptance of barge by the OWNER nor a release or termination of CHARTERER'S obligation hereunder to pay Charter Hire. Provided that in case of total loss, Charter Hire shall cease from the date the said barge is determined to be a total loss.

6. Payment of charter hire shall continue without termination, abatement or suspension for any cause until such day as the vessel is re-delivered to the OWNER at the termination of the


initials    initials

3

charter in accordance with all the provisions of this agreement. If the vessel is lost, payments shall be made up to and including the day of her loss. Any and all payments called for herein shall be made in U.S. Dollars.

7.    CHARTERER agrees that the barge shall be used only for lawful purposes and only in the usual and ordinary course of CHARTERER'S business. CHARTERER agrees to employ this barge only within the scope of operations as permitted by her current marine documentation. CHARTERER agrees to comply with each and every aspect of the certified engineered Barge Deck Protection Plan (hereinafter "Protection Plan") that was prepared for CHARTERER. The Protection Plan is incorporated herein by reference. CHARTERER agrees to promptly notify OWNER within twenty-four (24) hours of any casualty or damage to the barge, including minor casualties, damages or breakdowns. Nothing contained herein shall be deemed to prohibit or deny to the OWNER or the CHARTERER the benefit of all limitations of, and exemptions from, liability accorded to the OWNER and operators of the vessel by any statute or rule of law for the time being in force.

8.    CHARTERER shall have the use, during the charter period of all equipment, furniture, furnishings, appliances and spare/replacement parts furnished with the vessel upon delivery. Such items, or their substantial equivalent, shall be returned to OWNER at the termination of the charter duration called for herein in the same good order and condition as when received, ordinary wear and tear excepted. CHARTERER may install additional equipment on the vessel which may be necessary in connection with CHARTERER'S operations, provided that no structural changes may be made without OWNER'S prior written consent. CHARTERER may remove equipment installed by CHARTERER, provided that CHARTERER shall, before the termination date of this agreement, restore the vessel to the same condition existing prior to installation of any such equipment, fixtures or furnishings. CHARTERER shall bear any and all costs/expense incurred in installation and/or removal of such items and/or reconstruction of any authorized structural changes to restore the vessel to such condition and configuration as it was in upon initial delivery to CHARTERER.

9.    CHARTERER shall, in the use, operation of the barge, comply with all applicable Federal, State, Municipal and local laws and with the rules, orders, regulations, directives and requirements of any department, commission, and bureau, and with all local ordinances and regulations, and shall indemnify, protect, defend and hold harmless OWNER and Vessel against any libels, maritime liens, claims, charges, encumbrances, fines, attorney fees, suits or penalties which may be imposed upon or filed against OWNER or upon the barge by reason of any violation by CHARTERER or the barge of such laws, rules, orders, regulations, directives and requirements.

(a) To the fullest extent permitted by law, and without in any manner limiting OWNER'S rights and remedies in the event of a breach of this Agreement, CHARTERER agrees to indemnify, defend (with legal counsel selected by OWNER in its sole and absolute discretion), and hold harmless OWNER and its divisions, affiliates, parents and subsidiary companies, and its officers, partners, designees, directors, shareholders, members, consultants, predecessors, successors, assigns, agents, representatives and employees of OWNER with an interest in the rental of any equipment supplied herein pursuant to this Agreement for CHARTERER'S Project (hereinafter "Project"), and each and all of them (individually, "Indemnified Party" and collectively, "Indemnified Parties") from and against any and all claims, demands, causes of action, liabilities, judgments, settlements, losses, costs, inspections, re inspections, damages and/or expenses in law or equity, contract or tort, (including, without limitation,



initials     initials

4

attorneys' fees, in-house legal fees, professional, expert and consultant fees, court costs, investigative costs, postage costs, document copying costs, telecopy costs and other costs and any and all other costs and expenses, (collectively, "Defense Expenses") of every kind and nature whatsoever (collectively, the "Claim" or "Claims") that in any way arise out of or relate to this Agreement, the Work hereunder or any other work performed or materials supplied by or on behalf of CHARTERER in, at, about or on the Project and arise out of or relate to, in whole or in part, the presence of, or activities conducted, in, at, about or on the Project, including, without limitation, any act or omission to act (including liability imposed without fault or on the basis of strict liability), active or passive negligence, or willful misconduct, by or for CHARTERER, anyone directly or indirectly employed, hired or used by CHARTERER or anyone for whose acts CHARTERER may be liable, regardless of the fault or negligence by CHARTERER or those for whom CHARTERER is liable. This Indemnification Obligation covers, without limitation, all claims that in any way arise out of or relate to: (i) personal injury, bodily injury or death (including, without limitation, emotional injury, physical injury, sickness, disease or death to any person, including, without limitation, employees, agents sub-subcontractors and suppliers of CHARTERER); (ii) defects in or damage to property of any kind whatsoever, including, without limitation, loss of use, enjoyment or occupancy thereof; (iii) penalties imposed or extra costs required on account of the violation of, or failure to comply with, any law, caused by or contributed to as a result of CHARTERER'S presence, or activities conducted by or for CHARTERER, in, at, about or on the Project, including, without limitation, any act or omission to act (including, without limitation, liability imposed without fault or on the basis of strict liability) by or for CHARTERER; (iv) infringement of any patent rights which may be brought against OWNER arising out of or relating to the Work; (v) failure of CHARTERER to provide or maintain any insurance as required herein below; (vi) any violation or infraction by CHARTERER of any law in any way relating to the occupational health or safety of employees, including, without limitation, the use of OWNER'S, or others', equipment and tools; (vii) defects in workmanship or materials and/or design defects (if the design originated with CHARTERER); and (viii)  CHARTERER'S presence, or activities conducted, in, at, about or on the Project (including, without limitation, the negligent and/or willful acts, errors and/or omissions of CHARTERER, its principals, partners, members, officers, agents, employees, vendors, suppliers, consultants, sub-consultants, sub-subcontractors, anyone employed directly or indirectly by any of them or for whose acts they may be liable or any or all of them). CHARTERER'S indemnification, defense and hold harmless obligations apply regardless of whether or not the injury and/or damage is caused in part by any active or passive negligence of an Indemnified Party. However, CHARTERER shall have no obligation to indemnify any Indemnified Party for any Claims which arise exclusively from such Indemnified Party's sole active negligence or willful misconduct.  Notwithstanding the foregoing, OWNER and CHARTERER agree that OWNER'S right to seek equitable indemnity and/or contribution from CHARTERER is in no way diminished or precluded by this agreement to provide express contractual indemnity and contribution to OWNER.

(b)  The indemnification, defense and hold harmless obligations of CHARTERER under this Paragraph and elsewhere in this Agreement (sometimes collectively, the "Indemnification Obligations") shall not be limited by the amounts or types of insurance (or the deductibles or self-insured retention amounts of such insurance) which CHARTERER is required to carry under this Agreement.  In Claims against any of the Indemnified Parties by an employee, agent, supplier or sub-subcontractor of CHARTERER, or anyone directly or indirectly employed, hired or used by CHARTERER or anyone for whose acts CHARTERER may be liable, the Indemnification Obligations shall not be limited by amounts or types of damages, compensation



or benefits payable by or for CHARTERER or anyone directly or indirectly employed by CHARTERER or anyone for whose acts CHARTERER may be liable. The Indemnification Obligations of CHARTERER shall be independent of and in addition to the Indemnified Parties' rights under the insurance to be provided by CHARTERER under this Agreement. The duty to defend hereunder is wholly independent of and separate from the duty to indemnify, regardless of any ultimate liability of CHARTERER. Such defense obligation shall arise immediately upon presentation of a Claim by any party and written notice of such Claim being provided to CHARTERER. Payment to CHARTERER by any Indemnified Party or the payment or advance of defense costs by any Indemnified Party shall not be a condition precedent to enforcing such Indemnified Party's rights to indemnification hereunder. Any obligation of CHARTERER to OWNER arising out of this indemnification clause shall bear interest at five percent (5%). It is the intent of the parties and CHARTERER agrees that Indemnified Parties (or any of them) may be strictly liable and this indemnification, defense and hold harmless provision applies whether the issue of CHARTERER'S liability, breach of this Agreement or other obligation or fault has been determined and whether the Indemnified Parties (or any of them) have paid any sums or incurred any detriment, arising out of or resulting directly or indirectly from CHARTERER'S performance of the Work or any other matter which may be the subject of indemnification hereunder. The Indemnification Obligations of CHARTERER shall apply with respect to any Claim (including claims for strict liability against OWNER), regardless of whether any allegation is made with respect to the negligence of, or fault of, CHARTERER. It is the parties' intention that the Indemnified Parties (or any of them) shall be entitled to obtain summary adjudication of CHARTERER'S duty to defend the Indemnified Parties at any stage of any suit within the scope of this Paragraph. CHARTERER shall be liable to pay for the defense of the Indemnified Parties as the costs of defense are incurred (making payment within ten (10) days of the date of any billing invoice) and at the amounts incurred. In the event one or more of the Indemnified Parties retains experts and/or legal counsel to defend as to multiple types of claims and/or as to the Work of multiple subcontractors, then CHARTERER agrees to, and shall, pay that portion of the bills (including without limitation, legal and expert expenses) that are allocated to CHARTERER'S Work by the attorneys and experts retained by such Indemnified Parties for their defense.

(c) The Indemnification Obligations shall survive the expiration or earlier termination of this Agreement, and shall continue until the last to occur of: (i) the last day permitted by law for the filing of any Claims as to which the Indemnification Obligations may apply; or (ii) the date on which all Claims to which the Indemnification Obligations may apply are fully and finally resolved and paid by CHARTERER.

(d) Pursuant to the Indemnification Obligations, CHARTERER agrees to reimburse OWNER for all costs and expenses (including, without limitation, attorneys' fees, in-house legal fees, consultant fees, professional or expert fees, court costs, investigative costs, postage costs, document copying costs, telecopy costs and any and all other costs and expenses) incurred by OWNER in connection with any action brought by OWNER to enforce CHARTERER'S obligations under the terms of this Paragraph or any good faith settlement of such actions by OWNER.

(e) CHARTERER understands and acknowledges that the Indemnification Obligations set forth in this Paragraph are intended to extend to and include Claims arising from the strict liability of, and the active or passive negligence of, Indemnified Parties. This Paragraph is intended to and shall be interpreted to provide for a specific indemnity of the Indemnified Parties to the fullest extent permitted by applicable law, with only those particular words or provisions declared inapplicable if required by applicable law. CHARTERER further understands and agrees that it shall immediately fulfill all of its Indemnification Obligations upon any


initials    initials

6

Indemnified Parties' written notice to CHARTERER of any Claim and without any order of any court regardless of whether any Indemnified Parties have made any payments as to the Claims, including without limitation, any payments for Defense Expenses.

(f) CHARTERER'S Indemnification Obligations shall extend, without limitation, to any and all Claims asserted or to be determined in alternative dispute resolution proceedings, including, without limitation, negotiations, conferences, mediations and/or arbitrations.

(g) Notwithstanding the foregoing, this Paragraph shall in no event be construed to limit Indemnified Parties' rights and remedies in the event of a breach of this Agreement. This Paragraph shall completely eliminate and preclude any right by CHARTERER to seek any contractual or equitable indemnity or contribution from Indemnified Parties. Further, Indemnified Parties' right to seek equitable indemnity or contribution from CHARTERER in no way shall be diminished or precluded by anything in this Agreement.

10.     During the charter period, CHARTERER shall, at its own cost and expense or by its own procurement, man, navigate, operate, maintain, supply the vessel and pay all charges and expenses of every nature whatsoever incidental thereto. CHARTERER shall have the full and exclusive uninterrupted use of the vessel during the charter period and OWNER retains no possession or control thereof whatsoever.

11.     OWNER shall maintain a U.S. Coast Guard Document in full force and effect throughout the duration of this charter agreement.

12.     CHARTERER shall not sub-charter, rent or lease the vessel without the express written consent of the OWNER first had and obtained.

13.     Subject to the terms and conditions of this agreement, OWNER has the right to sell, assign or transfer this agreement, or assign any payments due hereunder to any person, firm or corporation.

14.     OWNER warrants that it is the sole and absolute OWNER of the vessel, that it has the right to charter the same to CHARTERER, that the vessel is free and clear of any and all encumbrances that would preclude any such charter at the time of delivery. Further, OWNER warrants that neither OWNER or any assignee of OWNER'S rights hereunder will do or permit anything to disturb CHARTERER'S full right of possession and peaceful enjoyment thereof and that OWNER has exercised due diligence and prudence to insure that the vessel is seaworthy at the time of delivery.

15.     CHARTERER warrants that the vessel shall not be used or employed in war zone areas and agrees to indemnify OWNER against all loss, damages and expenses of whatever nature resulting from the capture, seizure, arrest, restraint and/or detainment and the consequences thereof and/or any attempted threats. Further, CHARTERER warrants and indemnifies OWNER against the actual consequences of hostilities and/or war like operations of any nature, in any location whether there be a declaration of war or not including acts and consequences of civil war, revolution, rebellion, insurrection or civil strife of whatever nature arising there from including any and all acts of piracy.

16.     Controversy or claims arising out of or relating to this contract, or the breach thereof, shall be governed by the general maritime law of the United States, insofar as applicable, otherwise by the laws of the State of Florida. The parties hereto agree to submit to the exclusive


Initials     Initials

7

jurisdiction of either the County Court or Circuit Court in and for Brevard County Florida. CHARTERER submits to the jurisdiction of the courts of the State of Florida, and consents to service of process in accordance with the Florida Rules of Civil Procedure.

17.    CHARTERER shall during the entire period of its performance of this Agreement, procure and maintain in force at its own expense and be responsible for all premiums, deductibles, self-insured retentions or other amounts for such insurance coverage in such form and in such amounts as are required to cover its responsibilities, liabilities and indemnification obligations under this agreement. Such insurance shall be provided by insurance carriers duly licensed to transact the proscribed coverage's in each jurisdiction in which Work will be performed and that have a current A.M. Best & Co. rating of not less then A-III:

| Workers' Compensation **endorsed to include:** A. U.S. Long Shore & Harbor Workers' Compensation Coverage; | Statutory $1,000,000 Each Employee $1,000,000 Policy Limit |
|---|---|
| Employer's Liability | $1,000,000 Each Accident $1,000,000 Each Employee $1,000,000 Policy Limit |
| Hull and Machinery | Agreed Stated Value of Barge ($400,000.00) Deductible ($10,000 per occurrence, $50,000, policy term aggregate) |
| Protection and Indemnity | $1,000,000 Policy Limit. Any one loss/any one Deductible ($5,000 bodily injury and $10,000, property damage) |
| Pollution Liability | $1,000,000 per occurrence $2,000,000 general aggregate Deductible $10,000 |
| Commercial General Liability **endorsed to exclude:** A. Waterborne/Watercraft policy exclusion language **or;** B. Customer must procure and maintain a separate Maritime General Liability (MGL) policy; | $1,000,000 per occurrence $2,000,000 general aggregate Deductible $10,000 |
| Excess/Umbrella Liability Coverage | $4,000,000 per occurrence $4,000,000 general aggregate |

CHARTERER shall fully comply with Workers' Compensation laws for any intended Work. If any portion of the Work is to be performed by CHARTERER adjacent to navigable waters, the policy shall be endorsed to include U.S. Long Shore & Harbor Workers' Compensation coverage.

Hull and Machinery insurance in an amount equal to the agreed stated value of the barge ($400,000.00), on the American Institute Hull Clauses January 18, 1970, or equivalent, with navigation limits adequate for vessel's trade, and subject to deductibles of $10,000.00, per occurrence and $50,000.00, per policy term aggregate.


initials       initials

Protection & indemnity Insurance (P&I) in the amount of $1,000,000.00 (Form SP-23 or equivalent), with same navigation limits as Hull and Machinery Insurance, subject to deductibles of $5,000.00, bodily injury and $10,00.00, property damage.

Pollution Liability in the amount of $1,000,000.00, per occurrence, $2,000,000.00, general aggregate insuring (i) costs of cleanup in the event of a spill or leakage and (ii) liability for third party claims in the event of a spill or leakage.  Any deductible applicable to (i) and (ii) above shall not exceed $10,000.00.

All Risk Marine Cargo Insurance is required for any cargo supplied by CHARTERER or its vendors, service providers or suppliers aboard the Tow in an amount equal to its full actual value at destination, on terms equivalent to the broadest coverage available from American Underwriters.

Commercial General Liability coverage must be at least as broad as the most recently promulgated version of ISO Form CG 0001 (Occurrence-Basis Coverage).  CHARTERER'S Commercial General Liability policy must contain an endorsement which excludes the watercraft/waterborne exclusion language found within CHARTERER'S policy otherwise, CHARTERER is required to procure and maintain a separate Maritime General Liability (MGL) policy for their intended Work and operations.  Excess/Umbrella Liability Coverage must be at least as broad as the underlying coverage's.

Prior to the commencement of performance of this Agreement, or as soon thereafter as is practicable, CHARTERER shall furnish OWNER with certificates of duplicate copies evidencing compliance with this insurance section.  No act of OWNER, in commencing performance of this Agreement or otherwise, shall constitute a waiver of compliance with this section by CHARTERER.  In addition to the coverage's outlined above, CHARTERER is responsible for providing appropriate coverage's and limits, subject to OWNER'S approval for all other Work-specific exposures.

All insurance policies required above and elsewhere (other than workers' compensation and marine cargo policies) shall name OWNER, and any additional parties designated by OWNER, as an additional insured inclusive of acts or omissions, as loss payee, and contain a waiver of subrogation in favor of OWNER.  Copies of the original policies shall be held by OWNER and its assigns and a provision requiring fifteen (15) days notice to OWNER from insurers prior to cancellation or substantial modification of said policies by the insurers.  All insurance policies shall be endorsed stating that such coverage as is provided by the policies for the benefit of an additional insured is primary and other coverage maintained by an additional insured (if any) shall be non-contributing.  If CHARTERER fails to secure and maintain the required insurance, OWNER shall have the right (without the legal obligation to do so) to secure the insurance in the amounts specified in the name of the CHARTERER, in which case, the contractor shall pay all premiums, deductibles, self-insured retentions or other amounts associated with the required insurance.

CHARTERER hereby covenants, agrees and binds itself, insofar and to the extent that the insurance's as provided herein do not cover, or are not available or sufficient to cover, the responsibility or liability, alleged or actual, of CHARTERER, and to protect, defend, hold harmless and indemnify OWNER of and from any and all type, nature and character of claims, suits or demands for loss, damage or injury of any nature whatsoever resulting from or in any way connected with this barge and/or its use, service and operation, whether or not caused in whole or in part, by, contributed to, or in any way connected with, fault, negligence or wrongful acts on the part of OWNER (sole or in part), or of CHARTERER, and/or the un-seaworthiness of the barge whether existing at the time of delivery hereunder or not.  Any equipment, machinery, supplies, cranes, excavators, frontend loaders, cargo, etc. (hereinafter "cargo"), not furnished by OWNER, placed and/or carried aboard this barge is placed and/or carried aboard at the sole risk

9

Initials      Initials

and expense of CHARTERER, and CHARTERER hereby assumes full responsibility and liability for any and all damage to the aforesaid cargo, and for its liabilities to third parties, and agrees to protect, indemnify and defend OWNER with separate insurance and indemnification in case of any loss to or caused by said cargo or the persons operating such cargo.

During the entire period of its performance under this agreement, CHARTERER is required to have all its vendors, service providers and suppliers working in conjunction with CHARTERER to procure and maintain in force at their expense and be responsible for all premiums, deductibles, self-insured retentions or other amounts for such insurance coverage in such form and in such amounts as are required by CHARTERER to cover their responsibilities, liabilities and indemnification obligations under this agreement. If CHARTERER fails to secure and maintain the required insurance for itself as well as its vendors, service providers or suppliers, then OWNER shall have the right (without the legal obligation to do so) to secure the insurance in the amounts specified in the name of the CHARTERER, in which case, the CHARTERER shall pay all premiums, deductibles, self-insured retentions or other amounts associated with the required insurance.

Prior to the commencement of performance of this Agreement, or as soon thereafter as is practicable, CHARTERER as well as its participating vendors, service providers and suppliers shall furnish OWNER with certificates of duplicate copies evidencing compliance with this Section. No act of OWNER, in commencing performance of this Agreement or otherwise, shall constitute a waiver of compliance with this Section by CHARTERER or its vendors, service providers or suppliers.

*See Addendum A for additional information regarding this agreement only.*

18.   In the event of a total loss of the vessel, actual or constructive from whatever cause, the proceeds of such insurance shall be paid to OWNER. In the event of damage less than a total or constructive total loss of the vessel, the proceeds of any and all such insurance shall be paid to OWNER. The OWNER binds and obligates itself to reimburse CHARTERER up to the amount, if any of such proceeds which CHARTERER may have expended in repairing and/or reconditioning said vessel damage which gave rise to the insurance claim and related settlement. In the event of third party claims, the proceeds of any insurance settlement shall likewise be paid to OWNER and OWNER binds and obligates itself to reimburse CHARTERER up to the amount of such proceeds for amounts expended by CHARTERER in payment of any such claims all in accordance with CHARTERER'S obligations as herein set-forth.

19.   Neither CHARTERER nor any of its officers, employees, agents, assigns, vendors, service providers, suppliers, subcontractors nor the Master or any other member of the crew of any vessel shall have any rights, expressed or implied via power of attorney or any other means to create, incur, suffer or permit to be placed or imposed upon the barge any maritime or other liens or any other type of encumbrances of whatever nature also including, but not limited to, any and all debts, charges or other financial obligations. In the event a maritime or other lien, encumbrance or charge shall be placed upon the barge or in the event the vessel shall be levied against in some form or taken into custody by virtue of any legal proceeding based upon a claim or cause of action of whatever nature, valid or otherwise, founded or unfounded and alleged to have arisen during the terms of this agreement, CHARTERER at its sole cost and expense shall, within ten (10) days, cause the barge to be released and the asserted libel, maritime or other lien or other encumbrances discharged in full.



Initials   Initials

10

20.   CHARTERER shall carry and keep a copy of this agreement with the vessel's papers on the vessel and an additional copy in CHARTERER'S office and shall exhibit or cause to be exhibited, a copy of the agreement to all persons, firms and corporations having business with said vessel which might give rise to any maritime or other lien, claim, charge or encumbrance of whatever nature.   CHARTERER shall notify any and all persons, firms and/or corporations furnishing repairs, providing maintenance, stores, supplies, fuel or other necessities to the vessel that neither CHARTERER, its officers, employees, agents or assigns including the Master and crew members of the vessel, have any right, power or authority to create, incur, permit to be placed or imposed upon the vessel, any maritime or other lien, claim, charge or encumbrance of whatever nature for whatever purpose or reason.

21.   CHARTERER shall, at all times during the charter period herein provide for and any extensions thereof, prominently display on the vessel notices to the effect that, the vessel is the property of the OWNER and that no person, firm, corporation or other entity has any authority to create, incur or suffer to permit to be place or imposed upon the vessel any lien, charge, claim, debt or other encumbrance of any nature whatsoever.

22.   All salvage and towage shall be for the CHARTERER'S benefit and CHARTERER hereby agrees that any and all repairs and maintenance occasioned by these activities shall be at the sole and exclusive cost of the CHARTERER.

23.   In the event of the vessel becoming a wreck or obstruction to navigation, the CHARTERER shall indemnify the OWNER against any and all monies whatsoever which the OWNER shall become liable to pay as a consequence of the vessel becoming a wreck or obstruction to navigation.

24.   This charter shall not be altered, amended cancelled not assigned, nor shall the vessel be sub-chartered, rented or subleased to third parties without the express prior written consent of CHARTERER and OWNER first had and obtained, which consent shall not be unreasonably withheld.

25.   OWNER retains the right to inspect or survey the vessel or to instruct a duly authorized and qualified surveyor to carry out any such survey on OWNER'S behalf to determine the condition of the vessel and insure proper maintenance and repair at such times and such places as the owner may select so long as said survey does not interfere with CHARTERER'S business and unrestricted use of the vessel as called for herein.

26.   CHARTERER and OWNER shall promptly notify in writing, one to the other within forty-eight (48) hours of the institution of any and all proceedings which may affect this agreement in any way, shape or form.   This shall be done on a timely and expedient basis.   If, at any time during the term of the charter, CHARTERER shall fail to perform any of its duties or obligations or shall violate any of the prohibitions imposed upon it under this charter, or if the CHARTERER shall be dissolved or be adjudged bankrupt or shall have a petition in bankruptcy filed against it, or shall make a general assignment for the benefit of creditors, or if a receiver or receivers shall be appointed for the CHARTERER, the OWNER may, without prejudice to any other rights it may have under  this charter, withdraw and retake the said barge, wherever the same may be found, and without legal process.   Any costs whatsoever incurred by the OWNER in this regard shall be chargeable to the CHARTERER and termination of the Charter Hire



11

hereunder shall not relieve the CHARTERER of his duty to redeliver the vessel to the OWNER in a good and seaworthy condition.

27.     At the option of the OWNER, subject to the terms, duration and conditions of this agreement, OWNER shall have the right to offer said vessel for sale to any and all parties who may be at interest and on such terms and conditions as the parties may agree LESS and EXCEPT that CHARTERER shall have the right of first refusal on any and all such offering during the term of this lease and within 30 days after termination of this agreement. OWNER warrants that any such sale of said vessel shall include a clear title to said vessel free and clear of any and all mortgage, liens or other encumbrances of whatever nature.

28.     All notices and charter hire payments to OWNER shall be directed to the attention of Joseph D. Beyel, President, facsimile transmission (321) 631-0371; email joe.beyel@beyel.com, and mail to Beyel Brothers, Inc., 550 Cidco Road, Cocoa, Florida 32926. All notices to CHARTERER shall be directed to the attention of Michael Betancourt, facsimile transmission (954) 640-4401; email michael@betancourtconstructions.com and mail to 10461 SW 16th Place, David, FL 33324. All notices required under this Agreement shall be sent by United States mail, certified, return receipt requested, postage prepaid, or by express delivery, fees prepaid, or by personal delivery. The date of any notice so sent will be deemed to be the date of receipt. If any notice mailed or sent by United States mail or by express delivery service is properly addressed with appropriate charges prepaid but is returned because the intended recipient refuses delivery or can no longer be found at the current notice address, such notice shall be deemed effective notice and to be given on the date such delivery is refused or cannot be accomplished. All such notices shall be sent to the respective address of the party set forth herein, unless notice of another address is given to the party sending such notice in compliance with the provisions hereof.

29.     Should OWNER retain an attorney or seek recourse in a court of law for the purpose of enforcing any terms of this charter agreement, including any of the hold harmless and indemnity provisions contained within this agreement, or to collect any sums due there under, including, but not limited to charter hire, redelivery costs, damages, repairs, clean up costs, then all reasonable legal fees, expenses and costs incurred by OWNER even during all levels of appeal shall be immediately due and payable to OWNER upon demand from CHARTERER.

30.     The person signing below on behalf of CHARTERER warrants (i) having read and understood the provisions, and (ii) having been authorized to sign this Agreement on behalf of CHARTERER.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the date first here in above written in the presence of the undersigned witnesses after a due reading of the whole.

BY: _____          BY: _____
Joseph D. Beyel, President for          Betancourt Construction, Inc.
Beyel Brothers, Inc.  11 20 14

 
Initials   Initials

12

*ADDENDUM A*

*Beyel Brothers, Inc. hereby acknowledges that as part of their Hull and P&I insurance policy with Liberty International (#ATAAL202003), Towers Liability insurance is in place and in full effect at all times, including the duration of the agreement with Betancourt Construction, Inc.*



13

## ABS BARGE BAREBOAT CHARTER AGREEMENT

THIS AGREEMENT is entered into this 14th *14 @ 11/14/14* day of November, 2014, by and between BEYEL BROTHERS, INC., hereinafter referred to as "OWNER", whose offices are located at 550 Cidco Road, Cocoa, Florida 32926 and Betancourt Construction, Inc. hereinafter known as "CHARTERER", whose offices are located at 10461 SW 16th Place, Davie, FL  33324.

WITNESSETH:

1.   OWNER does hereby charter, bareboat, and CHARTERER does hereby agree to hire, bareboat, the following described barge and accessories for the indicated period and rates to wit:

A.   EQUIPMENT:  1990 Oregon Iron Works Landing Craft, Serial #50WB8917, Official #1220880 (Unit BB103).  This ~~barge~~ has an agreed stated value of $100,000.00
*Landing Craft @ 11/14/14 to be known as Barge in this agreement*

B.   CHARTER PERIOD:  There is a minimum (2) two month charter period for said barge which will begin when the barge leaves the OWNER'S facility in ~~Merritt Island,~~ FL and will end when the barge is returned to the OWNER'S facility in ~~Merritt Island,~~ FL in like good order and condition as when received by CHARTERER.  *Ft. Pierce   Ft. Pierce @ 11/14/14*

C.   CHARTER HIRE:  The barge charter hire is $8,500.00, per month, with a 30 day pro-ration of hire per day (i.e. $283.33), or part thereof after (2) two months.  The charter hire for the minimum stated charter period specified above shall become fully and irrevocably earned by OWNER upon the barge leaving OWNER'S dock for CHARTERER'S designated berth in and around Guantanamo Bay, Cuba.

~~D.   CHARTER DECK BARGE PROTECTION PLAN:  The CHARTERER at its expense will provide OWNER with a certified deck protection plan for OWNER'S barge which is prepared, certified and signed by a licensed engineer familiar with marine engineering, coastal construction as well as CHARTERER'S intended scope of use for said barge during the entire charter period.~~ *@ 11/14/14*

E.   MOBILIZATION and DEMOBILIZATION:  CHARTERER will pay OWNER the sum of  $0 to have OWNER mobilize the barge from Merritt Island, FL and deliver the same to CHARTERER'S designated berth in Guantanamo Bay, Cuba, and the sum of $0 to have OWNER demobilize the barge from CHARTERER'S designated berth in Guantanamo Bay, Cuba and redeliver the vessel to OWNER'S facility in Merritt Island, FL.  ~~The total amount of $300,000.00 includes fuel each way.~~  *@ 11/14/14   @ 11/14/14*

F.   SECURITY DEPOSIT:  CHARTERER will pay OWNER, a security deposit in the sum of $0. This amount will be held by the OWNER as security for the full, complete, and faithful performance of CHARTERER'S obligations hereunder. If CHARTERER fails to pay charter hire, repair costs, recertification costs, insurance deductibles which may arise or other charges due hereunder, or otherwise defaults with respect to any provision of this bareboat charter agreement, OWNER may use, apply, or retain all or any portion of said security deposit for the payment of any charter hire, repairs costs, recertification costs, insurance deductibles or other charge in default or for the payment of any other sum to which CHARTERER may become obligated by reason of CHARTERER'S default, or to compensate OWNER for any loss or damage which OWNER may suffer thereby.  If OWNER so uses or applies all or any portion of

1


initials   initials

**EXHIBIT "B"**

said security deposit, CHARTERER shall, within ten (10) days after written demand therefore, deposit cash with OWNER in an amount sufficient to restore said security deposit to the full amount hereinabove stated. The security deposit, or so much thereof as has not theretofore been applied by OWNER as provided herein, shall be returned to CHARTERER within thirty (30) days after the expiration of the term of this bareboat charter agreement.

G.   CHARTER PAYMENT: The charter hire, survey fees (see section 5A) and round trip mobilization costs for the agreed (2) two month charter period is **$17,000.00** This amount is exclusive of any damages or additional costs, fees and expenses which may arise during the charter period.  The above-noted charter hire, fees and costs plus the above- described security deposit in the sum of **$0**, must be paid in full together by CHARTERER to OWNER prior to commencement of this barge bareboat charter agreement.  If this charter should extend beyond (2) two months then the above-stated monthly charter hire shall be issued and made payable to OWNER in full without discount every month, in advance, at the address of the OWNER as provided herein.  After the minimum charter period, any unused advanced charter hire thereafter shall be immediately refunded to CHARTERER so long as CHARTERER is in strict compliance with all the terms and conditions of this charter agreement including but not limited to an off-hire survey that is satisfactory to OWNER showing no damage other than ordinary wear and tear to the barge and her equipment FURTHER, should CHARTERER, at any time fail to pay charter hire/rental when due, or fail to fulfill any other condition or obligation of this agreement then within five (5) days after written notice of default given to CHARTERER by OWNER, OWNER shall have the right to declare this agreement terminated, null and void, to take possession of the vessel wherever the same may be located without any notice of protest and without any interference by CHARTERER, it agents or assigns.  Any delay in charter hire/rental payments shall be payable with interest due at 18% percent per annum.

2.   This charter is a full and complete demise of 1990 Oregon Iron Works Landing Craft, Serial #50WB8917, Official #1220880 (Unit BB103) to the CHARTERER, which CHARTERER shall, at its own expense, navigate, supply, operate and maintain said barge. OWNER retains no possession or control whatsoever of the barge during the term of this Agreement or any extension thereof. CHARTERER shall have exclusive possession, control, and command of the barge during said charter period.  CHARTERER warrants the barge shall be employed by CHARTERER only in suitable, safe, lawful trade and operations, and will not be navigated nor used in any improper or negligent manner for its proposed service.  CHARTERER further warrants that the barge will be employed only between and at safe ports, places, berths, or anchorages where she can be always safely afloat, and within the navigation limits of the applicable insurances.

3.   OWNER shall deliver the barge to CHARTERER at CHARTERER'S designated berth in Guantanamo Bay, Cuba. Upon termination the barge shall be redelivered to OWNER at CHARTERER'S designated berth in Guantanamo Bay, Cuba in like good order and condition as when received ordinary wear and tear excepted at Guantanamo Bay, Cuba (or elsewhere by mutual agreement) and the Charter Hire shall continue until such redelivery of the barge to Owner's facility in Merritt Island, FL.  If on return of the barge, OWNER is put to any expense of repairs to the hull, deck, or superstructure of the barge or cleaning of the barge to put it in the same good, seaworthy and clean condition as upon delivery, CHARTERER agrees to reimburse OWNER for said expense and to pay charter hire until the date OWNER'S barge is returned to the same good, seaworthy and clean condition.


initials   initials

2

4.      The delivery to CHARTERER of the barge shall establish conclusively that CHARTERER, has inspected or has caused to be inspected or has elected to waive inspection of the barge. CHARTERER acknowledges an opportunity to thoroughly inspect the barge and its machinery and appurtenances, or will make such an inspection before acceptance, and that he agrees to rely solely upon such inspection with respect to the condition of the barge or its suitability for the intended service, has found them fully satisfactory for his purposes, accepts them "as is", and acknowledges that there are no warranties or representations of seaworthiness of the barge or its machinery or equipment, or of their fitness or suitability for any particular purpose.

5.      CHARTERER agrees to maintain the barge in a good and seaworthy condition during the term of this charter and will redeliver the barge to OWNER in the same good and seaworthy condition as when the barge was received, ordinary wear and tear excepted.

a) OWNER shall cause an on-charter hire condition survey to be conducted prior to possession of the barge by CHARTERER. CHARTERER shall pay $0 for on-charter hire condition survey. OWNER shall cause an off-charter hire condition survey to be conducted at the termination of the charter upon physical redelivery of the barge to the OWNER. CHARTERER shall pay $0 for off-charter hire condition survey. Upon written request to OWNER a copy of the condition survey(s) will be provided to CHARTERER.  It is agreed by both parties that the said condition survey(s) shall be conclusive proof as to the damage, if any, sustained by the barge during the time of this charter.  CHARTERER is to remove all welds flush to deck and if necessary paint such areas to OWNER's full satisfaction.

b) In the event damage greater than normal wear and tear is noted by the condition survey(s), then it shall be the CHARTERER'S absolute duty to: (i) pay OWNER for any and all costs and expenses that are necessary to fully repair all noted damages; (ii) pay OWNER for any and all costs and expenses associated with recertifying the barge; and (ii) pay the above-noted monthly Charter Hire in advance until the barge is fully repaired and recertified to the OWNER'S full and complete satisfaction.

c) The cost of said repairs and recertification's shall be payable by the CHARTERER immediately upon presentation to it of the repair and recertification invoices.

d) In the event OWNER performs repairs or caused repairs and/or recertification's to be performed by others on the barge, then CHARTERER shall be conclusively bound by the amount of said repair and recertification invoices and waives its rights to contest the reasonableness of the amount thereof.

e) It is further understood and agreed that in the event damage is noted as per this numbered paragraph, then physical redelivery of the barge by the CHARTERER shall not constitute acceptance of barge by the OWNER nor a release or termination of CHARTERER'S obligation hereunder to pay Charter Hire.  Provided that in case of total loss, Charter Hire shall cease from the date the said barge is determined to be a total loss.

6.      Payment of charter hire shall continue without termination, abatement or suspension for any cause until such day as the vessel is re-delivered to the OWNER at the termination of the


Initials   Initials

3

charter in accordance with all the provisions of this agreement. If the vessel is lost, payments shall be made up to and including the day of her loss. Any and all payments called for herein shall be made in U.S. Dollars.

7.     CHARTERER agrees that the barge shall be used only for lawful purposes and only in the usual and ordinary course of CHARTERER'S business. CHARTERER agrees to employ this barge only within the scope of operations as permitted by her current marine documentation. CHARTERER agrees to comply with each and every aspect of the certified engineered Barge Deck Protection Plan (hereinafter "Protection Plan") that was prepared for CHARTERER. The Protection Plan is incorporated herein by reference. CHARTERER agrees to promptly notify OWNER within twenty-four (24) hours of any casualty or damage to the barge, including minor casualties, damages or breakdowns. Nothing contained herein shall be deemed to prohibit or deny to the OWNER or the CHARTERER the benefit of all limitations of, and exemptions from, liability accorded to the OWNER and operators of the vessel by any statute or rule of law for the time being in force.

8.     CHARTERER shall have the use, during the charter period of all equipment, furniture, furnishings, appliances and spare/replacement parts furnished with the vessel upon delivery. Such items, or their substantial equivalent, shall be returned to OWNER at the termination of the charter duration called for herein in the same good order and condition as when received, ordinary wear and tear excepted. CHARTERER may install additional equipment on the vessel which may be necessary in connection with CHARTERER'S operations, provided that no structural changes may be made without OWNER'S prior written consent. CHARTERER may remove equipment installed by CHARTERER, provided that CHARTERER shall, before the termination date of this agreement, restore the vessel to the same condition existing prior to installation of any such equipment, fixtures or furnishings. CHARTERER shall bear any and all costs/expense incurred in installation and/or removal of such items and/or reconstruction of any authorized structural changes to restore the vessel to such condition and configuration as it was in upon initial delivery to CHARTERER.

9.     CHARTERER shall, in the use, operation of the barge, comply with all applicable Federal, State, Municipal and local laws and with the rules, orders, regulations, directives and requirements of any department, commission, and bureau, and with all local ordinances and regulations, and shall indemnify, protect, defend and hold harmless OWNER and Vessel against any libels, maritime liens, claims, charges, encumbrances, fines, attorney fees, suits or penalties which may be imposed upon or filed against OWNER or upon the barge by reason of any violation by CHARTERER or the barge of such laws, rules, orders, regulations, directives and requirements.

(a) To the fullest extent permitted by law, and without in any manner limiting OWNER'S rights and remedies in the event of a breach of this Agreement, CHARTERER agrees to indemnify, defend (with legal counsel selected by OWNER in its sole and absolute discretion), and hold harmless OWNER and its divisions, affiliates, parents and subsidiary companies, and its officers, partners, designees, directors, shareholders, members, consultants, predecessors, successors, assigns, agents, representatives and employees of OWNER with an interest in the rental of any equipment supplied herein pursuant to this Agreement for CHARTERER'S Project (hereinafter "Project"), and each and all of them (individually, "Indemnified Party" and collectively, "Indemnified Parties") from and against any and all claims, demands, causes of action, liabilities, judgments, settlements, losses, costs, inspections, re inspections, damages and/or expenses in law or equity, contract or tort, (including, without limitation,


initials        initials

4

attorneys' fees, in-house legal fees, professional, expert and consultant fees, court costs, investigative costs, postage costs, document copying costs, telecopy costs and other costs and any and all other costs and expenses, (collectively, "Defense Expenses") of every kind and nature whatsoever (collectively, the "Claim" or "Claims") that in any way arise out of or relate to this Agreement, the Work hereunder or any other work performed or materials supplied by or on behalf of CHARTERER in, at, about or on the Project and arise out of or relate to, in whole or in part, the presence of or activities conducted, in, at, about or on the Project, including, without limitation, any act or omission to act (including liability imposed without fault or on the basis of strict liability), active or passive negligence, or willful misconduct, by or for CHARTERER, anyone directly or indirectly employed, hired or used by CHARTERER or anyone for whose acts CHARTERER may be liable, regardless of the fault or negligence by CHARTERER or those for whom CHARTERER is liable. This Indemnification Obligation covers, without limitation, all claims that in any way arise out of or relate to: (i) personal injury, bodily injury or death (including, without limitation, emotional injury, physical injury, sickness, disease or death to any person, including, without limitation, employees, agents sub-subcontractors and suppliers of CHARTERER); (ii) defects in or damage to property of any kind whatsoever, including, without limitation, loss of use, enjoyment or occupancy thereof; (iii) penalties imposed or extra costs required on account of the violation of, or failure to comply with, any law, caused by or contributed to as a result of CHARTERER'S presence, or activities conducted by or for CHARTERER, in, at, about or on the Project, including, without limitation, any act or omission to act (including, without limitation, liability imposed without fault or on the basis of strict liability) by or for CHARTERER; (iv) infringement of any patent rights which may be brought against OWNER arising out of or relating to the Work; (v) failure of CHARTERER to provide or maintain any insurance as required herein below; (vi) any violation or infraction by CHARTERER of any law in any way relating to the occupational health or safety of employees, including, without limitation, the use of OWNER'S, or others', equipment and tools; (vii) defects in workmanship or materials and/or design defects (if the design originated with CHARTERER); and (viii)  CHARTERER'S presence, or activities conducted, in, at, about or on the Project (including, without limitation, the negligent and/or willful acts, errors and/or omissions of CHARTERER, its principals, partners, members, officers, agents, employees, vendors, suppliers, consultants, sub-consultants, sub-subcontractors, anyone employed directly or indirectly by any of them or for whose acts they may be liable or any or all of them). CHARTERER'S indemnification, defense and hold harmless obligations apply regardless of whether or not the injury and/or damage is caused in part by any active or passive negligence of an Indemnified Party. However, CHARTERER shall have no obligation to indemnify any Indemnified Party for any Claims which arise exclusively from such Indemnified Party's sole active negligence or willful misconduct. Notwithstanding the foregoing, OWNER and CHARTERER agree that OWNER'S right to seek equitable indemnity and/or contribution from CHARTERER is in no way diminished or precluded by this agreement to provide express contractual indemnity and contribution to OWNER.

(b) The indemnification, defense and hold harmless obligations of CHARTERER under this Paragraph and elsewhere in this Agreement (sometimes collectively, the "Indemnification Obligations") shall not be limited by the amounts or types of insurance (or the deductibles or self-insured retention amounts of such insurance) which CHARTERER is required to carry under this Agreement.   In Claims against any of the Indemnified Parties by an employee, agent, supplier or sub-subcontractor of CHARTERER, or anyone directly or indirectly employed, hired or used by CHARTERER or anyone for whose acts CHARTERER may be liable, the Indemnification Obligations shall not be limited by amounts or types of damages, compensation


initials   initials

5

or benefits payable by or for CHARTERER or anyone directly or indirectly employed by CHARTERER or anyone for whose acts CHARTERER may be liable. The Indemnification Obligations of CHARTERER shall be independent of and in addition to the Indemnified Parties' rights under the insurance to be provided by CHARTERER under this Agreement. The duty to defend hereunder is wholly independent of and separate from the duty to indemnify, regardless of any ultimate liability of CHARTERER. Such defense obligation shall arise immediately upon presentation of a Claim by any party and written notice of such Claim being provided to CHARTERER. Payment to CHARTERER by any Indemnified Party or the payment or advance of defense costs by any Indemnified Party shall not be a condition precedent to enforcing such Indemnified Party's rights to indemnification hereunder. Any obligation of CHARTERER to OWNER arising out of this indemnification clause shall bear interest at five percent (5%). It is the intent of the parties and CHARTERER agrees that Indemnified Parties (or any of them) may be strictly liable and this indemnification, defense and hold harmless provision applies whether the issue of CHARTERER'S liability, breach of this Agreement or other obligation or fault has been determined and whether the Indemnified Parties (or any of them) have paid any sums or incurred any detriment, arising out of or resulting directly or indirectly from CHARTERER'S performance of the Work or any other matter which may be the subject of indemnification hereunder. The Indemnification Obligations of CHARTERER shall apply with respect to any Claim (including claims for strict liability against OWNER), regardless of whether any allegation is made with respect to the negligence of, or fault of, CHARTERER. It is the parties' intention that the Indemnified Parties (or any of them) shall be entitled to obtain summary adjudication of CHARTERER'S duty to defend the Indemnified Parties at any stage of any suit within the scope of this Paragraph. CHARTERER shall be liable to pay for the defense of the Indemnified Parties as the costs of defense are incurred (making payment within ten (10) days of the date of any billing invoice) and at the amounts incurred. In the event one or more of the Indemnified Parties retains experts and/or legal counsel to defend as to multiple types of claims and/or as to the Work of multiple subcontractors, then CHARTERER agrees to, and shall, pay that portion of the bills (including without limitation, legal and expert expenses) that are allocated to CHARTERER'S Work by the attorneys and experts retained by such Indemnified Parties for their defense.

(c) The Indemnification Obligations shall survive the expiration or earlier termination of this Agreement, and shall continue until the last to occur of: (i) the last day permitted by law for the filing of any Claims as to which the Indemnification Obligations may apply; or (ii) the date on which all Claims to which the Indemnification Obligations may apply are fully and finally resolved and paid by CHARTERER.

(d) Pursuant to the Indemnification Obligations, CHARTERER agrees to reimburse OWNER for all costs and expenses (including, without limitation, attorneys' fees, in-house legal fees, consultant fees, professional or expert fees, court costs, investigative costs, postage costs, document copying costs, telecopy costs and any and all other costs and expenses) incurred by OWNER in connection with any action brought by OWNER to enforce CHARTERER'S obligations under the terms of this Paragraph or any good faith settlement of such actions by OWNER.

(e) CHARTERER understands and acknowledges that the Indemnification Obligations set forth in this Paragraph are intended to extend to and include Claims arising from the strict liability of, and the active or passive negligence of, Indemnified Parties. This Paragraph is intended to and shall be interpreted to provide for a specific indemnity of the Indemnified Parties to the fullest extent permitted by applicable law, with only those particular words or provisions declared inapplicable if required by applicable law. CHARTERER further understands and agrees that it shall immediately fulfill all of its Indemnification Obligations upon any


initials          initials

6

Indemnified Parties' written notice to CHARTERER of any Claim and without any order of any court regardless of whether any Indemnified Parties have made any payments as to the Claims, including without limitation, any payments for Defense Expenses.

(f)  CHARTERER'S Indemnification Obligations shall extend, without limitation, to any and all Claims asserted or to be determined in alternative dispute resolution proceedings, including, without limitation, negotiations, conferences, mediations and/or arbitrations.

(g)  Notwithstanding the foregoing, this Paragraph shall in no event be construed to limit Indemnified Parties' rights and remedies in the event of a breach of this Agreement. This Paragraph shall completely eliminate and preclude any right by CHARTERER to seek any contractual or equitable indemnity or contribution from Indemnified Parties. Further, Indemnified Parties' right to seek equitable indemnity or contribution from CHARTERER in no way shall be diminished or precluded by anything in this Agreement.

10.   During the charter period, CHARTERER shall, at its own cost and expense or by its own procurement, man, navigate, operate, maintain, supply the vessel and pay all charges and expenses of every nature whatsoever incidental thereto. CHARTERER shall have the full and exclusive uninterrupted use of the vessel during the charter period and OWNER retains no possession or control thereof whatsoever.

11.   ...OWNER shall maintain a U.S. Coast Guard Document in full force and effect throughout the duration of this charter agreement.

12.   CHARTERER shall not sub-charter, rent or lease the vessel without the express written consent of the OWNER first had and obtained.

13.   Subject to the terms and conditions of this agreement, OWNER has the right to sell, assign or transfer this agreement, or assign any payments due hereunder to any person, firm or corporation.

14.   OWNER warrants that it is the sole and absolute OWNER of the vessel, that it has the right to charter the same to CHARTERER, that the vessel is free and clear of any and all encumbrances that would preclude any such charter at the time of delivery. Further, OWNER warrants that neither OWNER or any assignee of OWNER'S rights hereunder will do or permit anything to disturb CHARTERER'S full right of possession and peaceful enjoyment thereof and that OWNER has exercised due diligence and prudence to insure that the vessel is seaworthy at the time of delivery.

15.   CHARTERER warrants that the vessel shall not be used or employed in war zone areas and agrees to indemnify OWNER against all loss, damages and expenses of whatever nature resulting from the capture, seizure, arrest, restraint and/or detainment and the consequences thereof and/or any attempted threats. Further, CHARTERER warrants and indemnifies OWNER against the actual consequences of hostilities and/or war like operations of any nature, in any location whether there be a declaration of war or not including acts and consequences of civil war, revolution, rebellion, insurrection or civil strife of whatever nature arising there from including any and all acts of piracy.

16.   Controversy or claims arising out of or relating to this contract, or the breach thereof, shall be governed by the general maritime law of the United States, insofar as applicable, otherwise by the laws of the State of Florida. The parties hereto agree to submit to the exclusive

7



initials    initials

jurisdiction of either the County Court or Circuit Court in and for Brevard County Florida. CHARTERER submits to the jurisdiction of the courts of the State of Florida, and consents to service of process in accordance with the Florida Rules of Civil Procedure.

17.    CHARTERER shall during the entire period of its performance of this Agreement, procure and maintain in force at its own expense and be responsible for all premiums, deductibles, self-insured retentions or other amounts for such insurance coverage in such form and in such amounts as are required to cover its responsibilities, liabilities and indemnification obligations under this agreement. Such insurance shall be provided by insurance carriers duly licensed to transact the proscribed coverage's in each jurisdiction in which Work will be performed and that have a current A.M. Best & Co. rating of not less then A-III:

| | |
|---|---|
| Workers' Compensation **endorsed to include:**<br>A.  U.S. Long Shore & Harbor Workers'<br>Compensation Coverage; | Statutory<br>$1,000,000 Each Employee<br>$1,000,000 Policy Limit |
| Employer's Liability | $1,000,000 Each Accident<br>$1,000,000 Each Employee<br>$1,000,000 Policy Limit |
| Hull and Machinery | Agreed Stated Value of Barge ($100,000.00)<br>Deductible ($10,000 per occurrence, $50,000, policy term aggregate) |
| Protection and Indemnity | $1,000,000 Policy Limit.  Any one loss/any one<br>Deductible ($5,000 bodily injury and $10,000, property damage) |
| Pollution Liability | $1,000,000 per occurrence<br>$2,000,000 general aggregate<br>Deductible $10,000 |
| Commercial General Liability **endorsed to exclude:**<br>A.  Waterborne/Watercraft policy exclusion language **or;**<br>B.  Customer must procure and maintain a separate Maritime General Liability (MGL) policy; | $1,000,000 per occurrence<br>$2,000,000 general aggregate<br>Deductible $10,000 |
| Excess/Umbrella Liability Coverage | $4,000,000 per occurrence<br>$4,000,000 general aggregate |

CHARTERER shall fully comply with Workers' Compensation laws for any intended Work.  If any portion of the Work is to be performed by CHARTERER adjacent to navigable waters, the policy shall be endorsed to include U.S. Long Shore & Harbor Workers' Compensation coverage.

Hull and Machinery insurance in an amount equal to the agreed stated value of the barge ($100,000.00), on the American Institute Hull Clauses January 18, 1970, or equivalent, with navigation limits adequate for vessel's trade, and subject to deductibles of $10,000.00, per occurrence and $50,000.00, per policy term aggregate.


initials    initials

8

Protection & indemnity Insurance (P&I) in the amount of $1,000,000.00 (Form SP-23 or equivalent), with same navigation limits as Hull and Machinery Insurance, subject to deductibles of $5,000.00,bodily injury and $10,00.00, property damage.

Pollution Liability in the amount of $1,000,000.00, per occurrence, $2,000,000.00, general aggregate insuring (i) costs of cleanup in the event of a spill or leakage and (ii) liability for third party claims in the event of a spill or leakage. Any deductible applicable to (i) and (ii) above shall not exceed $10,000.00.

All Risk Marine Cargo Insurance is required for any cargo supplied by CHARTERER or its vendors, service providers or suppliers aboard the Tow in an amount equal to its full actual value at destination, on terms equivalent to the broadest coverage available from American Underwriters.

Commercial General Liability coverage must be at least as broad as the most recently promulgated version of ISO Form CG 0001 (Occurrence-Basis Coverage). CHARTERER'S Commercial General Liability policy must contain an endorsement which excludes the watercraft/waterborne exclusion language found within CHARTERER'S policy otherwise, CHARTERER is required to procure and maintain a separate Maritime General Liability (MGL) policy for their intended Work and operations. Excess/Umbrella Liability Coverage must be at least as broad as the underlying coverage's.

Prior to the commencement of performance of this Agreement, or as soon thereafter as is practicable, CHARTERER shall furnish OWNER with certificates of duplicate copies evidencing compliance with this insurance section. No act of OWNER, in commencing performance of this Agreement or otherwise, shall constitute a waiver of compliance with this section by CHARTERER. In addition to the coverage's outlined above, CHARTERER is responsible for providing appropriate coverage's and limits, subject to OWNER'S approval for all other Work-specific exposures.

All insurance policies required above and elsewhere (other than workers' compensation and marine cargo policies) shall name OWNER, and any additional parties designated by OWNER, as an additional insured inclusive of acts or omissions, as loss payee, and contain a waiver of subrogation in favor of OWNER. Copies of the original policies shall be held by OWNER and its assigns and a provision requiring fifteen (15) days notice to OWNER from insurers prior to cancellation or substantial modification of said policies by the insurers. All insurance policies shall be endorsed stating that such coverage as is provided by the policies for the benefit of an additional insured is primary and other coverage maintained by an additional insured (if any) shall be non-contributing. If CHARTERER fails to secure and maintain the required insurance, OWNER shall have the right (without the legal obligation to do so) to secure the insurance in the amounts specified in the name of the CHARTERER, in which case, the contractor shall pay all premiums, deductibles, self-insured retentions or other amounts associated with the required insurance.

CHARTERER hereby covenants, agrees and binds itself, insofar and to the extent that the insurance's as provided herein do not cover, or are not available or sufficient to cover, the responsibility or liability, alleged or actual, of CHARTERER, and to protect, defend, hold harmless and indemnify OWNER of and from any and all type, nature and character of claims, suits or demands for loss, damage or injury of any nature whatsoever resulting from or in any way connected with this barge and/or its use, service and operation, whether or not caused in whole or in part, by, contributed to, or in any way connected with, fault, negligence or wrongful acts on the part of OWNER (sole or in part), or of CHARTERER, and/or the un-seaworthiness of the barge whether existing at the time of delivery hereunder or not. Any equipment, machinery, supplies, cranes, excavators, frontend loaders, cargo, etc. (hereinafter "cargo"), not furnished by OWNER, placed and/or carried aboard this barge is placed and/or carried aboard at the sole risk

9


initials   initials

and expense of CHARTERER, and CHARTERER hereby assumes full responsibility and liability for any and all damage to the aforesaid cargo, and for its liabilities to third parties, and agrees to protect, indemnify and defend OWNER with separate insurance and indemnification in case of any loss to or caused by said cargo or the persons operating such cargo.

During the entire period of its performance under this agreement, CHARTERER is required to have all its vendors, service providers and suppliers working in conjunction with CHARTERER to procure and maintain in force at their expense and be responsible for all premiums, deductibles, self-insured retentions or other amounts for such insurance coverage in such form and in such amounts as are required by CHARTERER to cover their responsibilities, liabilities and indemnification obligations under this agreement. If CHARTERER fails to secure and maintain the required insurance for itself as well as its vendors, service providers or suppliers, then OWNER shall have the right (without the legal obligation to do so) to secure the insurance in the amounts specified in the name of the CHARTERER, in which case, the CHARTERER shall pay all premiums, deductibles, self-insured retentions or other amounts associated with the required insurance.

Prior to the commencement of performance of this Agreement, or as soon thereafter as is practicable, CHARTERER as well as its participating vendors, service providers and suppliers shall furnish OWNER with certificates of duplicate copies evidencing compliance with this Section. No act of OWNER, in commencing performance of this Agreement or otherwise, shall constitute a waiver of compliance with this Section by CHARTERER or its vendors, service providers or suppliers.

18.     In the event of a total loss of the vessel, actual or constructive from whatever cause, the proceeds of such insurance shall be paid to OWNER. In the event of damage less than a total or constructive total loss of the vessel, the proceeds of any and all such insurance shall be paid to OWNER. The OWNER binds and obligates itself to reimburse CHARTERER up to the amount, if any of such proceeds which CHARTERER may have expended in repairing and/or reconditioning said vessel damage which gave rise to the insurance claim and related settlement. In the event of third party claims, the proceeds of any insurance settlement shall likewise be paid to OWNER and OWNER binds and obligates itself to reimburse CHARTERER up to the amount of such proceeds for amounts expended by CHARTERER in payment of any such claims all in accordance with CHARTERER'S obligations as herein set-forth.

19.     Neither CHARTERER nor any of its officers, employees, agents, assigns, vendors, service providers, suppliers, subcontractors nor the Master or any other member of the crew of any vessel shall have any rights, expressed or implied via power of attorney or any other means to create, incur, suffer or permit to be placed or imposed upon the barge any maritime or other liens or any other type of encumbrances of whatever nature also including, but not limited to, any and all debts, charges or other financial obligations. In the event a maritime or other lien, encumbrance or charge shall be placed upon the barge or in the event the vessel shall be levied against in some form or taken into custody by virtue of any legal proceeding based upon a claim or cause of action of whatever nature, valid or otherwise, founded or unfounded and alleged to have arisen during the terms of this agreement, CHARTERER at its sole cost and expense shall, within ten (10) days, cause the barge to be released and the asserted libel, maritime or other lien or other encumbrances discharged in full.

20.     CHARTERER shall carry and keep a copy of this agreement with the vessel's papers on the vessel and an additional copy in CHARTERER'S office and shall exhibit or cause to be exhibited, a copy of the agreement to all persons, firms and corporations having business with

Initials   Initials

10

said vessel which might give rise to any maritime or other lien, claim, charge or encumbrance of whatever nature. CHARTERER shall notify any and all persons, firms and/or corporations furnishing repairs, providing maintenance, stores, supplies, fuel or other necessities to the vessel that neither CHARTERER, its officers, employees, agents or assigns including the Master and crew members of the vessel, have any right, power or authority to create, incur, permit to be placed or imposed upon the vessel, any maritime or other lien, claim, charge or encumbrance of whatever nature for whatever purpose or reason.

21. CHARTERER shall, at all times during the charter period herein provide for and any extensions thereof, prominently display on the vessel notices to the effect that, the vessel is the property of the OWNER and that no person, firm, corporation or other entity has any authority to create, incur or suffer to permit to be place or imposed upon the vessel any lien, charge, claim, debt or other encumbrance of any nature whatsoever.

22. All salvage and towage shall be for the CHARTERER'S benefit and CHARTERER hereby agrees that any and all repairs and maintenance occasioned by these activities shall be at the sole and exclusive cost of the CHARTERER.

23. In the event of the vessel becoming a wreck or obstruction to navigation, the CHARTERER shall indemnify the OWNER against any and all monies whatsoever which the OWNER shall become liable to pay as a consequence of the vessel becoming a wreck or obstruction to navigation.

24. This charter shall not be altered, amended cancelled not assigned, nor shall the vessel be sub-chartered, rented or subleased to third parties without the express prior written consent of CHARTERER and OWNER first had and obtained, which consent shall not be unreasonably withheld.

25. OWNER retains the right to inspect or survey the vessel or to instruct a duly authorized and qualified surveyor to carry out any such survey on OWNER'S behalf to determine the condition of the vessel and insure proper maintenance and repair at such times and such places as the owner may select so long as said survey does not interfere with CHARTERER'S business and unrestricted use of the vessel as called for herein.

26. CHARTERER and OWNER shall promptly notify in writing, one to the other within forty-eight (48) hours of the institution of any and all proceedings which may affect this agreement in any way, shape or form. This shall be done on a timely and expedient basis. If, at any time during the term of the charter, CHARTERER shall fail to perform any of its duties or obligations or shall violate any of the prohibitions imposed upon it under this charter, or if the CHARTERER shall be dissolved or be adjudged bankrupt or shall have a petition in bankruptcy filed against it, or shall make a general assignment for the benefit of creditors, or if a receiver or receivers shall be appointed for the CHARTERER, the OWNER may, without prejudice to any other rights it may have under this charter, withdraw and retake the said barge, wherever the same may be found, and without legal process. Any costs whatsoever incurred by the OWNER in this regard shall be chargeable to the CHARTERER and termination of the Charter Hire hereunder shall not relieve the CHARTERER of his duty to redeliver the vessel to the OWNER in a good and seaworthy condition.


initials   initials

11

27.     At the option of the OWNER, subject to the terms, duration and conditions of this agreement, OWNER shall have the right to offer said vessel for sale to any and all parties who may be at interest and on such terms and conditions as the parties may agree LESS and EXCEPT that CHARTERER shall have the right of first refusal on any and all such offering during the term of this lease and within 30 days after termination of this agreement. OWNER warrants that any such sale of said vessel shall include a clear title to said vessel free and clear of any and all mortgage, liens or other encumbrances of whatever nature.

28.     All notices and charter hire payments to OWNER shall be directed to the attention of Joseph D. Beyel, President, facsimile transmission (321) 631-0371; email joe.beyel@beyel.com, and mail to Beyel Brothers, Inc., 550 Cidco Road, Cocoa, Florida 32926. All notices to CHARTERER shall be directed to the attention of Michael Betancourt, facsimile transmission (954) 640-4401; email michael@betancourtconstructions.com and mail to 10461 SW 16th Place, David, FL 33324.   All notices required under this Agreement shall be sent by United States mail, certified, return receipt requested, postage prepaid, or by express delivery, fees prepaid, or by personal delivery. The date of any notice so sent will be deemed to be the date of receipt. If any notice mailed or sent by United States mail or by express delivery service is properly addressed with appropriate charges prepaid but is returned because the intended recipient refuses delivery or can no longer be found at the current notice address, such notice shall be deemed effective notice and to be given on the date such delivery is refused or cannot be accomplished. All such notices shall be sent to the respective address of the party set forth herein, unless notice of another address is given to the party sending such notice in compliance with the provisions hereof.

29.     Should OWNER retain an attorney or seek recourse in a court of law for the purpose of enforcing any terms of this charter agreement, including any of the hold harmless and indemnity provisions contained within this agreement, or to collect any sums due there under, including, but not limited to charter hire, redelivery costs, damages, repairs, clean up costs, then all reasonable legal fees, expenses and costs incurred by OWNER even during all levels of appeal shall be immediately due and payable to OWNER upon demand from CHARTERER.

30.     The person signing below on behalf of CHARTERER warrants (i) having read and understood the provisions, and (ii) having been authorized to sign this Agreement on behalf of CHARTERER.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the date first here in above written in the presence of the undersigned witnesses after a due reading of the whole.

BY: _____          BY: _____
Joseph D. Beyel, President for                    Betancourt Construction, Inc.
Beyel Brothers, Inc. 11/17/14                      S. Michael Betancourt, President

12





# THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA



**BOND NO. K08000037**

# SUBCONTRACT
# PERFORMANCE BOND

Any singular reference to Principal, Surety, Obligee or other party shall be considered plural where applicable.

**PRINCIPAL (SUBCONTRACTOR)**
**(Name and Address):**
BETANCOURT CONSTRUCTION, INC.
10481 SW 16 PL
DAVIE, FL 33324

**OBLIGEE (CONTRACTOR)**
**(Name and Address):**
HARRY PEPPER & ASSOCIATES, INC.
9000 REGENCY SQUARE BLVD, SUITE 100
JACKSONVILLE, FL 32211

**SURETY (Name and Address of Surety Company Office):**
WESTCHESTER FIRE INSURANCE COMPANY
436 Walnut Street, P.O. Box 1000
Philadelphia, PA 19106

**SUBCONTRACT**
   Date:
   Amount: $ 2,575,000.00 — (Two Million, Five Hundred Seventy-Five Thousand, and 00/100 Dollars)
   Description of Project (Name and Location):
      HURRICANE SANDY WATERFRONT REPAIRS
      MARINE CONSTRUCTION WORK, US Naval Base, Guantanamo Bay, Cuba
      CONTRACT NO. N69750-12-D-1272 TASK ORDER 0002| HPA776-S007/10160

**BOND**
   Date (Not earlier than Subcontract Date): NOVEMBER 13, 2014
   Penal Amount: $ 2,575,000.00 — (Two Million, Five Hundred Seventy-Five Thousand, and 00/100 Dollars)

**SUBCONTRACTOR AS PRINCIPAL**
Company:                    (Corporate Seal)
BETANCOURT CONSTRUCTION, INC.

Signature:
Name and Title: S. Michael Betancourt
                        President

Witness:

(Any additional signatures appear on page attached)

**SURETY**
Company:                    (Corporate Seal)
WESTCHESTER FIRE INSURANCE COMPANY

Signature:
Name and Title:                D.N. MATSON III,
                        Attorney-in-Fact & Florida Resident Agent
Attach Power of Attorney

Witness:

**FOR INFORMATION ONLY**
**AGENT or BROKER:**
**(Name, Address and Telephone)**

MATSON-CHARLTON SURETY GROUP - 700 S. DIXIE HIGHWAY, STE 100; CORAL GABLES, FL 33146 - P: (305) 662-3852

AGC DOCUMENT NO. 606 • SUBCONTRACT PERFORMANCE BOND • 1988
© 1988. The Associated General Contractors of America

**EXHIBIT "C"**

# **Articles**

1. **SCOPE OF BOND.** The Principal and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Obligee for the performance of the Subcontract, which is incorporated in this bond by reference. In no event shall the Surety's total obligation exceed the penal amount of this bond.

2. **EFFECT OF OBLIGATION.** If the Principal performs the Subcontract, then this bond shall be null and void; otherwise it shall remain in full force and effect.

3. **ALTERATION NOTICE WAIVER.** The Surety hereby waives notice of any alteration or extension of the Subcontract, including but not limited to the Subcontract price and/or time, made by the Obligee. This waiver shall not apply to the time for suit provided by paragraph 5 hereunder.

4. **PRINCIPAL DEFAULT.** Whenever the Principal shall be, and is declared by the Obligee to be in default under the Subcontract, with the Obligee having performed its obligations in the Subcontract, the Surety may promptly remedy the default, or shall promptly:

    4.1 **COMPLETE SUBCONTRACT.** Complete the Subcontract in accordance with its terms and conditions; or

    4.2 **OBTAIN NEW CONTRACTORS.** Obtain a bid or bids formally, informally or negotiated for completing the Subcontract in accordance with its terms and conditions, and upon determination by the Surety of the lowest responsible bidder, or negotiated proposal, or, if the Obligee elects, upon determination by the Obligee and the Surety jointly of the lowest responsible bidder, or negotiated proposal, arrange for a contract between such party and the Obligee. The Surety will make available as work progresses sufficient funds to pay the cost of completion less the balance of the contract price. The cost of completion includes responsibilities of the Principal for correction of defective work and completion of the Subcontract; the Obligee's legal and design professional costs resulting directly from the Principal's default, and; liquidated damages or actual damages if no liquidated damages are specified in the Subcontract. The term "balance of the contract price," as used in this paragraph, shall mean the total amount payable by the Obligee to the Principal under the Subcontract and any amendments to it, less the amount properly paid by the Obligee to the principal; or

    4.3 **PAY OBLIGEE.** Determine the amount for which it is liable to the Obligee and pay the Obligee that amount as soon as practicable; or

    4.4 **DENY LIABILITY.** Deny its liability in whole or in part and notify and explain to the Obligee the reasons why the Surety believes it does not have responsibility for this liability.

5. **TIME FOR SUIT.** Any suit under this bond must be instituted before the expiration of two (2) years from the date of substantial completion as established by the contract documents.

6. **RIGHT OF ACTION.** No right of action shall accrue on this bond to or for the use of any person or entity other than the Obligee named herein, its heirs, executors, administrators or successors.

©1988, The Associated General Contractors of America

# THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA



**BOND NO. K08000037**

# SUBCONTRACT
# PAYMENT BOND

Any singular reference to Principal, Surety, Obligee or other party shall be considered plural where applicable.

**PRINCIPAL (SUBCONTRACTOR)**
**(Name and Address):**
BETANCOURT CONSTRUCTION, INC.
10461 SW 16 PL
DAVIE, FL 33324

**SURETY (Name and Address of Surety**
**Company Office):**
WESTCHESTER FIRE INSURANCE COMPANY
436 Walnut Street, P.O. Box 1000
Philadelphia, PA 19106

**OBLIGEE (CONTRACTOR)**
**(Name and Address):**
HARRY PEPPER & ASSOCIATES, INC.
9000 REGENCY SQUARE BLVD, SUITE 100
JACKSONVILLE, FL 32211

**SUBCONTRACT**

Date:

Amount: $2,575,000.00 — (Two Million, Five Hundred Seventy-Five Thousand, and 00/100 Dollars)

Description of Project (Name and Location):

HURRICANE SANDY WATERFRONT REPAIRS
- MARINE CONSTRUCTION WORK, US Naval Base, Guantanamo Bay, Cuba
CONTRACT NO. N69750-12-D-1272 TASK ORDER 0002 | HPA776-S007/10160

**BOND**

Date (Not earlier than Subcontract Date): NOVEMBER 13, 2014

Penal Amount: $2,575,000.00 — (Two Million, Five Hundred Seventy-Five Thousand, and 00/100 Dollars)

**SUBCONTRACTOR AS PRINCIPAL**
Company:               (Corporate Seal)
BETANCOURT CONSTRUCTION, INC.

Signature: _____ 11/14/14

Name and Title: S. Michael Betancourt
President

Witness: _____

(Any additional signatures appear on page attached)

**SURETY**
Company:               (Corporate Seal
WESTCHESTER FIRE INSURANCE COMPANY

Signature: _____

Name and Title: _____
D.W. MATSON III,
Attorney-in-Fact & Florida Resident Agent

Attach Power of Attorney

Witness: _____

**FOR INFORMATION ONLY**
**AGENT or BROKER:**
**(Name, Address and Telephone)**

MATSON-CHARLTON SURETY GROUP - 700 S. DIXIE HIGHWAY, STE 100; CORAL GABLES, FL 33146 - P: (305) 662-3852

AGC DOCUMENT NO. 607 • SUBCONTRACT PAYMENT BOND • 1988

©1988, The Associated General Contractors of Ameri

# Articles

1. **SCOPE OF BOND.** The Principal and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Obligee to pay for labor, materials and equipment furnished for use in the performance of the Subcontract, which is incorporated in this bond by reference and pursuant to which this bond is issued. In no event shall the Surety's total obligation exceed the penal amount of this bond.

2. **EFFECT OF OBLIGATION.** If the Principal shall promptly make payment directly or indirectly to all Claimants as defined in this bond, for all labor, material and equipment used in the performance of the Subcontract, then this bond shall be null and void; otherwise it shall remain in full force and effect, subject, however, to the following conditions:

   2.1 **TIME FOR CLAIM.** The Principal and Surety hereby jointly and severally agree with the Obligee that every Claimant, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such Claimant's work or labor was done or performed, or materials were furnished by such Claimant, for which claim is made, may have a right of action on this bond. The Obligee shall not be liable for the payment of any costs or expenses including attorneys' fees which the Obligee may incur in connection with its defense of any such right of action.

   2.2 **RIGHT OF ACTION.** No suit or action shall be commenced on this bond by any Claimant:

      2.2.1 Unless Claimant, other than one having a direct contract with the Principal, shall have given written notice to any two of the following: Principal, Obligee, or the Surety above named, within ninety (90) days after such Claimant did or performed the last of the work or labor, or furnished the last of the materials for which said claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were furnished, or for whom the work or labor was done or performed. Such notice shall be served by mailing the same by registered mail or certified mail, postage prepaid, in an envelope addressed to the Principal, Obligee or Surety, at any place within the United States where an office is regularly maintained for the transaction of business, or served in any manner in which legal process may be served in the state in which the aforesaid Project is located, however, such service need not be made by a public officer.

      2.2.2 After the expiration of one (1) year from the date (1) on which the Claimant gave the notice required by Subparagraph 2.2.1, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone on the Project, whichever first occurs. Any limitation embodied in this bond, which is prohibited by any law controlling the Project, shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

      2.2.3 Other than in a state court of competent jurisdiction in and for the county or other political subdivision of the state in which the Project, or any part thereof, is situated, or in the United States District Court for the district in which the Project, or any part thereof, is situated, and not elsewhere.

3. **CLAIMANT.** A Claimant is defined as an individual or entity having a direct contract with the Principal to furnish labor, materials or equipment for use in the performance of the Subcontract or any individual or entity having valid lien rights which may be asserted in the jurisdiction where the Project is located. The intent of this bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the Subcontract, architectural and engineering services required for performance of the work of the Principal, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

4. **AMOUNT OF BOND.** The amount of this bond shall be reduced by and to the extent of any payment or payments made in good faith by the Surety.

5. **ALTERATION NOTICE WAIVER.** The Surety waives notice of any alteration or extension of the Subcontract, including but not limited to the Subcontract price and/or time, made by the Obligee. This waiver shall not apply to the time for suit provided by Paragraph 2.2 hereunder.

AGC DOCUMENT NO. 607 • SUBCONTRACT PAYMENT BOND • 1988

©1988, The Associated General Contractors of America

# WESTCHESTER FIRE INSURANCE COMPANY

## Power of Attorney

Know all men by these presents: That WESTCHESTER FIRE INSURANCE COMPANY, a corporation of the Commonwealth of Pennsylvania pursuant to the following Resolutions, adopted by the Board of Directors of the said Company on December 11, 2006, to wit:

"RESOLVED, that the following authorizations relate to the execution, for and on behalf of the Company, of bonds, undertakings, recognizances, contracts and other written commitments of the Company entered into the ordinary course of business (each a "Written Commitment"):

(1) Each of the Chairman, the President and the Vice Presidents of the Company is hereby authorized to execute any Written Commitment for and on behalf of the Company, under the seal of the Company or otherwise.

(2) Each duly appointed attorney-in-fact of the Company is hereby authorized to execute any Written Commitment for and on behalf of the Company, under the seal of the Company or otherwise, to the extent that such action is authorized by the grant of powers provided for in such person's written appointment as such attorney-in-fact.

(3) Each of the Chairman, the President and the Vice Presidents of the Company is hereby authorized, for and on behalf of the Company, to appoint in writing any person the attorney-in-fact of the Company with full power and authority to execute, for and on behalf of the Company, under the seal of the Company or otherwise, such Written Commitments of the Company as may be specified in such written appointment, which specification may be by general type or class of Written Commitments or by specification of one or more particular Written Commitments.

(4) Each of the Chairman, the President and the Vice Presidents of the Company is hereby authorized, for and on behalf of the Company, to delegate in writing to any other officer of the Company the authority to execute, for and on behalf of the Company, under the Company's seal or otherwise, such Written Commitments of the Company as are specified in such written delegation, which specification may be by general type or class of Written Commitments or by specification of one or more particular Written Commitments.

(5) The signature of any officer or other person executing any Written Commitment or appointment or delegation pursuant to this Resolution, and the seal of the Company, may be affixed by facsimile on such Written Commitment or written appointment or delegation.

FURTHER RESOLVED, that the foregoing Resolution shall not be deemed to be any limitation on the powers and authority of officers, employees and other persons to act for and on behalf of the Company, and such Resolution shall not limit or otherwise affect the exercise of any such power or authority otherwise validly granted or vested."

Does hereby nominate, constitute and appoint D.W. Feltman III, John W Chatham all of the City of CORAL GABLES, Florida, each individually if there be more than one named, its true and lawful attorney-in-fact, to make, execute, seal and deliver on its behalf, and as its act and deed any and all bonds, undertakings, recognizances, contracts and other writings in the nature thereof in penalties not exceeding Twenty million dollars & zero cents ($20,000,000.00) and the execution of such writings in pursuance of these presents shall be as binding upon said Company as fully and amply as if they had been duly executed and acknowledged by the regularly elected officers of the Company at its principal office.

IN WITNESS WHEREOF, the said Stephen M. Haney, Vice-President, has hereunto subscribed his name and affixed the Corporate seal of the said WESTCHESTER FIRE INSURANCE COMPANY this 7 day of January 2013





WESTCHESTER FIRE INSURANCE COMPANY

Stephen M. Haney , Vice President

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF PHILADELPHIA

SS.

On this 7 day of January, A.D. 2013 before me, a Notary Public of the Commonwealth of Pennsylvania in and for the County of Philadelphia came Stephen M. Haney , Vice-President of the WESTCHESTER FIRE INSURANCE COMPANY to me personally known to be the individual and officer who executed the preceding instrument, and he acknowledged that he executed the same, and that the seal affixed to the preceding instrument is the corporate seal of said Company, that the said corporate seal and his signature were duly affixed by the authority and direction of the said corporation, and that Resolution, adopted by the Board of Directors of said Company, referred to in the preceding instrument, is now in force.



IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal at the City of Philadelphia the day and year first above written.

Notary Public

I, the undersigned Assistant Secretary of the WESTCHESTER FIRE INSURANCE COMPANY, do hereby certify that the original POWER OF ATTORNEY, of which the foregoing is a substantially true and correct copy, is in full force and effect.

In witness whereof, I have hereunto subscribed my name as Assistant Secretary, and affixed the corporate seal of the Corporation, this 13th day of NOVEMBER, 2014.

William L. Kelly, Assistant Secretary

THE BACK OF THIS DOCUMENT LISTS VARIOUS SECURITY FEATURES            THAT WILL PROTECT AGAINST COPY COUNTERFEIT AND ALTERATION.

Filing # 32956344 E-Filed 10/07/2015 02:52:33 PM

**FORM 1.997. CIVIL COVER SHEET**

The civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form shall be filed by the plaintiff or petitioner for the use of the Clerk of the Court for the purpose of reporting judicial workload data pursuant to Florida Statutes section 25.075.

**I.     CASE STYLE**

IN THE CIRCUIT COURT OF THE ELEVENTH  JUDICIAL CIRCUIT,
IN AND FOR MIAMI-DADE  COUNTY, FLORIDA

Case No.:_____
Judge: _____

Betancourt Construction, Inc., Westchester Fire Insurance
Plaintiff

vs.

Beyel Brothers, Inc.
Defendant

**II.     TYPE OF CASE**

☐ Condominium
☒ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence – other
   ☐ Business governance
   ☐ Business torts
   ☐ Environmental/Toxic tort
   ☐ Third party indemnification
   ☐ Construction defect
   ☐ Mass tort
   ☐ Negligent security
   ☐ Nursing home negligence
   ☐ Premises liability – commercial
   ☐ Premises liability – residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
   ☐ Commercial foreclosure $0 - $50,000
   ☐ Commercial foreclosure $50,001 - $249,999
   ☐ Commercial foreclosure $250,000 or more
   ☐ Homestead residential foreclosure $0 – 50,000
   ☐ Homestead residential foreclosure $50,001 - $249,999
   ☐ Homestead residential foreclosure $250,000 or more
   ☐ Non-homestead residential foreclosure $0 - $50,000
   ☐ Non-homestead residential foreclosure $50,001 - $249,999
   ☐ Non-homestead residential foreclosure $250,00 or more
   ☐ Other real property actions $0 - $50,000

☐ Other real property actions $50,001 - $249,999
☐ Other real property actions $250,000 or more

☐ Professional malpractice
   ☐ Malpractice – business
   ☐ Malpractice – medical
   ☐ Malpractice – other professional
☐ Other
   ☐ Antitrust/Trade Regulation
   ☐ Business Transaction
   ☐ Circuit Civil - Not Applicable
   ☐ Constitutional challenge-statute or ordinance
   ☐ Constitutional challenge-proposed amendment
   ☐ Corporate Trusts
   ☐ Discrimination-employment or other
   ☐ Insurance claims
   ☐ Intellectual property
   ☐ Libel/Slander
   ☐ Shareholder derivative action
   ☐ Securities litigation
   ☐ Trade secrets
   ☐ Trust litigation

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

III.   **REMEDIES SOUGHT** (check all that apply):
- ☒ Monetary;
- ☐ Non-monetary
- ☐ Non-monetary declaratory or injunctive relief;
- ☐ Punitive

IV.   **NUMBER OF CAUSES OF ACTION: (    )**
(Specify)

4

V.   **IS THIS CASE A CLASS ACTION LAWSUIT?**
- ☐ Yes
- ☒ No

VI.   **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
- ☒ No
- ☐ Yes – If "yes" list all related cases by name, case number and court:

VII.   **IS JURY TRIAL DEMANDED IN COMPLAINT?**
- ☒ Yes
- ☐ No

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief.

Signature s/ Peter B. Rowell          FL Bar No.: 0017600
          Attorney or party                                                      (Bar number, if attorney)

          Peter B. Rowell          10/07/2015
               (Type or print name)                                          Date